# Supreme Court of Florida

_____

No. SC17-506
_____

**RODRICK D. WILLIAMS,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[February 22, 2018]

LABARGA, C.J.

This case is before the Court for review of the decision of the Fifth District

Court of Appeal in *Williams v. State* (*Williams II*), 211 So. 3d 1070 (Fla. 5th DCA

2017). In its decision, the Fifth District ruled upon the following question certified

to be of great public importance:

> DOES *ALLEYNE V. UNITED STATES*, 570 U.S. 99, 133 S. Ct. 2151,
> 186 L. Ed. 2d 314 (2013), REQUIRE THE JURY AND NOT THE
> TRIAL COURT TO MAKE THE FACTUAL FINDING UNDER
> SECTION 775.082(1)(b), FLORIDA STATUTES (2016), AS TO
> WHETHER A JUVENILE OFFENDER ACTUALLY KILLED,
> INTENDED TO KILL, OR ATTEMPTED TO KILL THE VICTIM?

*Id.* at 1073. We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const. For the

reasons explained below, we hold that *Alleyne* requires a jury to make the factual

finding, but conclude that *Alleyne* violations are subject to harmless error review. Where the error cannot be deemed harmless, the proper remedy is to resentence the juvenile offender pursuant to section 775.082(1)(b)2., Florida Statutes (2016).

## FACTS AND PROCEDURAL BACKGROUND

On December 19, 2013, a jury found Petitioner Rodrick D. Williams guilty of first-degree murder and kidnapping. During the evening hours of April 26, 2010, and through the early morning hours of April 27, 2010, victim James Vincent Brookins was beaten and bound with duct tape at a "trap house"[1] in Jacksonville, then transported in the trunk of a vehicle to a rural road in St. Johns County, where he was shot twice. Two other individuals, Harry Henderson and Sharina Parker, were also involved in the death of Brookins. Williams and Parker were involved in a sexual relationship. Although Henderson and Parker were adults at the time of the murder, Williams was sixteen years old. The firearm used to commit the murder was never located.

The predominant evidence offered during trial to connect Williams to the offenses included: (1) the police interrogation of Williams, during which his

---

1. During trial, a St. Johns County Sheriff's Office detective explained that the term "trap house" is "a slang term for a house, an apartment, a whatever, residence where folks don't actually live. They just go there to either sell drugs or use drugs. It's kind of just a vacant residence."

mother was present and Williams signed a *Miranda*[2] waiver; (2) a text message purportedly sent by Williams to Parker at 6:24 p.m. on April 26, in which Williams stated, "Bae thx killah[3] i cant talk cuz im round 2 many people but jus chill bae ima take care of yo problems jus give me the greenlight"; and (3) the testimony of a jailhouse informant.

During the interrogation, Williams contended it was Henderson who shot Brookins. According to Williams, Parker called him between 2 and 3 p.m. on April 26—less than five hours before the text message was sent—and told him she had been robbed of marijuana by a relative of Brookins during a drug transaction, and Parker believed Brookins had "set her up." Williams asserted that Parker and Henderson brought Brookins to the trap house later that day in an attempt to force him to give them money or disclose the location of his safe, where Parker believed the stolen marijuana was stored. Parker subsequently picked up Williams and drove him to the trap house, where, upon entering the house, Williams saw "blood all over" and Brookins begging for his life. According to Williams, Henderson beat Brookins with a gun, and Henderson and Parker bound his arms and legs and covered his mouth with duct tape as Brookins screamed. Williams stated that

---

2. *Miranda v. Arizona*, 384 U.S. 436 (1966).

3. Williams's mother gave him the nickname "Killer."

while at the trap house, Parker told him she and Henderson planned to leave Brookins alive in the trunk of the vehicle.[4] Williams admitted he drove the vehicle with Brookins in the trunk to the rural road while Henderson and Parker rode in a separate vehicle. He stated that upon arriving, Henderson wiped down the vehicle used to transport Brookins, opened the trunk, and shot Brookins. Williams asserted that he only participated in the offenses because he feared he would be harmed if he refused.

In contrast, during trial, the informant testified that while they were housed together at the St. Johns County jail, Williams admitted that he brought a gun to the trap house and shot Brookins. According to the informant, Williams stated he was involved in the plan to lure Brookins to the trap house on the pretense of having gold teeth created[5] and then force him to disclose the location of his safe. Coincidentally, prior to his interactions with Williams, the informant was housed

---

4. However, Williams also contradicted himself by implying he knew Henderson and Parker planned to kill Brookins:

> I was telling them, I'm, like, "I'm not going to be driving this man around. Is y'all crazy? What if we get stopped? *I'm gonna catch this murder charge, not y'all.*" You know what I'm saying? . . . ["]And I'm not going to jail for y'all."

(Emphasis added.)

5. According to the informant, Brookins possessed portable equipment for creating gold teeth.

with codefendant Henderson at the St. Johns County jail. The informant testified on cross-examination that Henderson assisted him by filing a motion on his behalf with respect to a drug-related charge and, as a result of Henderson's assistance, the charge was dropped. However, the informant testified that Henderson never spoke with him about the Brookins homicide.

The jury was instructed on both first-degree premeditated murder and first-degree felony murder with robbery, attempted robbery, kidnapping, and attempted kidnapping as the underlying felonies; however, the verdict form did not require the jury to specify the theory upon which it found Williams guilty of first-degree murder. Upon conviction, the trial court sentenced Williams to life imprisonment with the possibility of parole in twenty-five years for the murder. The court relied upon *Horsley v. State* (*Horsley I*), 121 So. 3d 1130 (Fla. 5th DCA 2013), *quashed*, 160 So. 3d 393 (Fla. 2015), in which the Fifth District Court of Appeal addressed the implications of *Miller v. Alabama*, 567 U.S. 460 (2012), for Florida sentencing law. *See Williams v. State* (*Williams I*), 171 So. 3d 143, 144-45 (Fla. 5th DCA 2015). Because *Miller* determined "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," 567 U.S. at 479, the Fifth District in *Horsley I* held that in Florida, the only sentence available for a juvenile offender convicted of capital murder was life

imprisonment with the possibility of parole after twenty-five years. *Williams I*, 171 So. 3d at 144.

On appeal, the Fifth District affirmed Williams's convictions but reversed his sentence with respect to the murder conviction. *Id.* The district court recognized that while the trial court properly relied on *Horsley I* when it imposed the sentence, this Court subsequently granted review of *Horsley I* based upon a certified question. *Id.* at 144-45. In *Horsley v. State* (*Horsley II*), 160 So. 3d 393 (Fla. 2015), we held the appropriate remedy for juveniles whose sentences are unconstitutional under *Miller* is to resentence them in conformance with chapter 2014-220, Laws of Florida. *See Williams I*, 171 So. 3d at 144. Chapter 2014-220 was enacted to bring Florida juvenile sentencing law into compliance with United States Supreme Court Eighth Amendment jurisprudence. *See Horsley II*, 160 So. 3d at 394. It amended section 775.082(1), Florida Statutes, to provide, in pertinent part:

> (b)1. A person who actually killed, intended to kill, or attempted to kill the victim and who is convicted under s. 782.04 of a capital felony, or an offense that was reclassified as a capital felony, which was committed before the person attained 18 years of age shall be punished by a term of imprisonment for life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence. If the court finds that life imprisonment is not an appropriate sentence, such person shall be punished by a term of imprisonment of at least 40 years. A person sentenced pursuant to this subparagraph is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(a).

2.  A person who did not actually kill, intend to kill, or attempt to kill the victim and who is convicted under s. 782.04 of a capital felony, or an offense that was reclassified as a capital felony, which was committed before the person attained 18 years of age may be punished by a term of imprisonment for life or by a term of years equal to life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence.  A person who is sentenced to a term of imprisonment of more than 15 years is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(c).

Ch. 2014-220, § 1, Laws of Fla.  The session law also created section 921.1402,

Florida Statutes (2017), which provides, in pertinent part:

(2)(a)  A juvenile offender sentenced under s. 775.082(1)(b)1. is entitled to a review of his or her sentence after 25 years [unless the juvenile offender has been previously convicted of certain enumerated offenses that were part of a separate criminal transaction or episode].
. . . .
(c)  A juvenile offender sentenced to a term of more than 15 years under s. 775.082(1)(b)2., s. 775.082(3)(a)5.b., or s. 775.082(3)(b)2.b. is entitled to a review of his or her sentence after 15 years.

Ch. 2014-220, § 3, Laws of Fla.

The Fifth District in *Williams I* instructed the trial court as follows:

On remand, the trial court shall hold an individualized sentencing hearing . . . to consider the enumerated and other pertinent factors "relevant to the offense and [Williams's] youth and attendant circumstances."  Ch. 2014–220, § 2, Laws of Fla.  Because the jury did not find that Williams actually possessed and discharged a firearm during the crime, the court must make a written finding as to whether Williams killed, intended to kill, or attempted to kill the victim. Ch. 2014–220, § 1, Laws of Fla.  Based on that determination, after holding the individualized hearing, the trial court may sentence Williams to life imprisonment if it finds that life is an appropriate sentence.  *Id.*  If the trial court determines that life is not an

- 7 -

> appropriate sentence, then it should sentence Williams to a term of at least forty years' imprisonment. *Id.* Either way, unless Williams has a prior conviction of a felony enumerated in section three of chapter 2014–220, Laws of Florida, arising out of a separate criminal transaction or episode, he will receive a judicial review of his sentence after fifteen or twenty-five years, depending on the court's determination. *See* ch. 2014–220, § 3, Laws of Fla.

171 So. 3d at 145 (second alteration in original).

On September 30, 2015, Williams filed with the trial court a Motion to Empanel Jury. Williams asserted that because the finding that a juvenile offender actually killed, intended to kill, or attempted to kill the victim leads to a minimum forty-year sentence with a sentence review after twenty-five years—whereas a finding that the offender did not actually kill, intend to kill, or attempt to kill the victim results in there being no minimum sentence and a sentence review after fifteen years—*Alleyne* requires that this factual determination be made by a jury beyond a reasonable doubt. The trial court denied the motion on the basis that it had been directed by the Fifth District to make the finding.

After a hearing, the trial court found that Williams both actually killed and intended to kill Brookins. The court subsequently held a resentencing hearing on the first-degree murder conviction pursuant to section 921.1401, Florida Statutes (2016), and again sentenced Williams to life imprisonment, but with a sentence review in twenty-five years, as required by section 921.1402(2)(a), Florida Statutes (2016).

On appeal, Williams challenged the trial court's denial of his Motion to Empanel Jury. *Williams II*, 211 So. 3d at 1071. The Fifth District held that the trial court properly denied the motion, but noted that the *Alleyne* challenge appeared to have merit on the basis that the finding "increases both the mandatory-minimum from zero years to forty years—if the sentencing court determines that life is not an appropriate sentence—and the time for a sentence review hearing from fifteen years to twenty-five years." *Id.* at 1072-73. However, the Fifth District explained that in *Falcon v. State*, 162 So. 3d 954 (Fla. 2015), this Court stated the trial court was to make the finding of whether the defendant actually killed, intended to kill, or attempted to kill the victim. *Id.* at 1073.[6] As a result, the Fifth District certified the question now before this Court as one of great public importance.

## ANALYSIS

### *Alleyne v. United States*

In *Alleyne*, the defendant (Alleyne) was charged with using or carrying a firearm in relation to a crime of violence, as well as other federal offenses, arising from the robbery of a store manager. 570 U.S. at 103. The applicable statute provided that anyone who uses or carries a firearm in relation to a crime of

---

6. Our decision in *Falcon* did not address the applicability of *Alleyne* to chapter 2014-220 because neither party raised the issue.

violence shall be sentenced to a minimum of five years in prison. *Id.* However, if the firearm is brandished, the statute mandated a minimum sentence of seven years' incarceration. *Id.* at 104. The jury convicted Alleyne and indicated on the verdict form that he used or carried a firearm; however, the jury did not indicate a finding that the firearm was brandished. *Id.* The trial court found that the evidence supported a finding of brandishing and imposed a seven-year sentence on this count. *Id.* The United States Court of Appeals for the Fourth Circuit affirmed. *Id.*

On certiorari review, the United States Supreme Court vacated the Fourth Circuit's judgment with respect to the sentence on the count of using or carrying a firearm in relation to a crime of violence and remanded for resentencing. *Id.* at 117-18. The Supreme Court held that any fact that increases the mandatory minimum sentence for an offense is an "element" which must be submitted to a jury and found beyond a reasonable doubt. *Id.* at 108. In reaching this holding, the Supreme Court relied upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in which it held that any fact that increases the statutory maximum sentence is an "element" of the offense to be found by a jury. *Alleyne*, 570 U.S. at 106; *see also Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

The Supreme Court explained that "*Apprendi*'s definition of 'elements' necessarily includes not only facts that increase the ceiling, but also those that increase the floor. Both kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment." *Alleyne*, 570 U.S. at 108. The Court further stated:

> [I]t is impossible to dispute that facts increasing the legally prescribed floor *aggravate* the punishment. Elevating the low end of a sentencing range heightens the loss of liberty associated with the crime: the defendant's "expected punishment has increased as a result of the narrowed range" and "the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish." *Apprendi*, *supra*, at 522, 120 S. Ct. 2348 (THOMAS, J., concurring). Why else would Congress link an increased mandatory minimum to a particular aggravating fact other than to heighten the consequences for that behavior? This reality demonstrates that the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury. [n.2]

> > [N.2.] Juries must find any facts that increase either the statutory maximum or minimum because the Sixth Amendment applies where a finding of fact both alters the legally prescribed range *and* does so in a way that aggravates the penalty. Importantly, this is distinct from factfinding used to guide judicial discretion in selecting a punishment "within limits fixed by law." *Williams v. New York*, 337 U.S. 241, 246 (1949). While such findings of fact may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern that element of sentencing.

*Id.* at 113 (citations omitted).

The Supreme Court rejected the contention that, because the seven-year sentence could have been imposed without the finding of brandishing, the Sixth Amendment right to trial by jury was not violated:

> [T]he essential Sixth Amendment inquiry is whether a fact is an element of the crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury. It is no answer to say that the defendant could have received the same sentence with or without that fact. It is obvious, for example, that a defendant could not be convicted and sentenced for assault, if the jury only finds the facts for larceny, even if the punishments prescribed for each crime are identical. One reason is that each crime has different elements and a defendant can be convicted only if the jury has found each element of the crime of conviction.
>
> Similarly, because the fact of brandishing aggravates the legally prescribed range of allowable sentences, it constitutes an element of a separate, aggravated offense that must be found by the jury, regardless of what sentence the defendant *might* have received if a different range had been applicable.

*Id.* at 114-15.

## Section 775.082(1)(b)

The relevant portion of section 775.082(1), Florida Statutes, provides:

> (b)1. *A person who actually killed, intended to kill, or attempted to kill the victim* and who is convicted under s. 782.04 of a capital felony, or an offense that was reclassified as a capital felony, which was committed before the person attained 18 years of age shall be punished by a term of imprisonment for life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence. If the court finds that life imprisonment is not an appropriate sentence, such person *shall be punished by a term of imprisonment of at least 40 years*. A person sentenced pursuant to this subparagraph is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(a).

2. A person who did not actually kill, intend to kill, or attempt to kill the victim and who is convicted under s. 782.04 of a capital felony, or an offense that was reclassified as a capital felony, which was committed before the person attained 18 years of age may be punished by a term of imprisonment for life or by a term of years equal to life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence. A person who is sentenced to a term of imprisonment of more than 15 years is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(c).

(Emphasis added.) Thus, a finding that a juvenile offender actually killed, intended to kill, or attempted to kill the victim results in a minimum sentence of forty years' imprisonment under subsection (1)(b)1. Without this finding, the trial court is not required to impose a minimum sentence. *See* § 775.082(1)(b)2., Fla. Stat. Further, under section 921.1402, a finding of actual killing, intent to kill, or attempt to kill entitles a juvenile offender to a sentence review in twenty-five years, whereas without the finding, the juvenile offender is entitled to a sentence review in fifteen years (provided the trial court imposes a sentence greater than fifteen years). § 921.1402(2)(a), (c), Fla. Stat. Because a finding of actual killing, intent to kill, or attempt to kill "aggravates the legally prescribed range of allowable sentences," *Alleyne*, 570 U.S. at 115, by increasing the sentencing floor from zero to forty years and lengthening the time before which a juvenile offender is entitled to a sentence review from fifteen to twenty-five years, this finding is an

"element" of the offense, which *Alleyne* requires be submitted to a jury and found beyond a reasonable doubt. *See id.* at 108.[7]

## The Verdict

In this case, the verdict form did not separate out the theories of first-degree murder; therefore, it is unclear whether the jury found Williams guilty of premeditated murder, felony murder, or both. Further, with respect to the offense of first-degree murder, there was no interrogatory on the verdict form as to whether Williams discharged a firearm.[8] Based upon the jury instructions given, it cannot be determined from the general verdict form whether the jury found beyond a reasonable doubt that Williams actually killed, intended to kill, or attempted to kill Brookins.

First, with respect to actual killing, as part of the instruction on premeditated first-degree murder, the jury received an instruction on principals, which allowed it to find Williams guilty even if he did not actually shoot Brookins. The jury was advised:

> If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if, one, the defendant had a conscious intent that the criminal act be done; and,

---

7. We recede from *Falcon* to the extent it concludes this determination is to be made by a trial court.

8. The lesser included offenses contained interrogatories.

two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to commit—to actually commit the crime.

Moreover, as part of the felony-murder instruction, the jury was instructed based both upon whether Williams was the actual killer or whether someone else shot Brookins:

> To prove the crime of first-degree felony murder, the State must prove the following three elements beyond a reasonable doubt:
>
> 1. That James Vincent Brookins is dead.
>
> 2. The death occurred as a consequence of and while Rodrick Williams was engaged in the commission of a robbery, an attempted robbery, kidnapping, or an attempted kidnapping.
>
> 3. That Rodrick Williams was a person who actually killed James Vincent Brookins, *or James Vincent Brookins was killed by a person other than Rodrick Williams* but both Rodrick Williams and the person who killed James Vincent Brookins were principals in the commission of a robbery, an attempted robbery, kidnapping, or an attempted kidnapping.

(Emphasis added.) Therefore, based upon the instructions given, the general guilty verdict for first-degree murder fails to demonstrate the jury found beyond a reasonable doubt that Williams actually killed Brookins.

Whether the jury found beyond a reasonable doubt that Williams intended to kill Brookins cannot be determined from the verdict either. The jury was instructed under the premeditated theory of first-degree murder that "[k]illing with premeditation is killing after consciously deciding to do so. The decision must be present in the mind at the time of the killing." Therefore, regardless of whether

- 15 -

Williams actually killed Brookins, or was a principal, a finding of intent to kill would have been inherent in a guilty verdict as to first-degree premeditated murder. However, the general verdict form that was used is problematic because the jury was instructed that "[i]n order to convict of first-degree felony murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill."

The jury found Williams guilty of the underlying felony of kidnapping. However, with respect to that offense, the jury was instructed as follows:

> To prove the crime of kidnapping, the State must prove the following three elements beyond a reasonable doubt:
>
> 1. That Rodrick Williams forcibly or by threat confined or abducted or imprisoned James Vincent Brookins against his will.
>
> 2. Rodrick Williams had no lawful authority.
>
> 3. Rodrick Williams acted *with intent to* commit or facilitate commission of robbery or attempted robbery . . . .
>
> 4. Or *inflict bodily harm upon* or to terrorize the victim or another person.

(Emphasis added.) Even if the jury found that Williams acted with the intent to inflict bodily harm upon Brookins,[9] this does not equate to an intent to kill.

---

9. During the interrogation, Williams admitted to hitting Brookins with his hands. The jailhouse informant testified that Williams stated he struck Brookins with a gun.

Based upon the foregoing, and because of the general verdict form with respect to the charge of first-degree murder, there is no clear jury finding that Williams actually killed, intended to kill, or attempted to kill Brookins. Therefore, an *Alleyne* violation occurred.

**Harmless Error**

Neither this Court nor the United States Supreme Court has addressed whether *Alleyne* violations are subject to harmless error review. We conclude such violations can be harmless. In *Apprendi*, the Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Supreme Court explained:

> [T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Id.* at 303-04 (citations omitted) (quoting 1 Joel Prentiss Bishop, *Criminal Procedure* § 87, at 55 (2d ed. 1872)). In *Washington v. Recuenco*, 548 U.S. 212, 215 (2006), the Supreme Court held that *Blakely* violations are subject to harmless

error review. *See also Galindez v. State*, 955 So. 2d 517, 522-23 (Fla. 2007) ("[T]o the extent some of our pre-*Apprendi* decisions may suggest that the failure to submit factual issues to the jury is not subject to harmless error analysis, *Recuenco* has superseded them."). Because *Blakely* derived from *Apprendi*, and *Blakely* errors are subject to harmless error review, we conclude that *Alleyne* violations can be harmless as well.

In *Galindez*, after concluding that *Apprendi* violations are subject to harmless error review, this Court delineated the applicable consideration under the facts of that case:

> Count I charged that "on various occasions" in a four-month period, Galindez "committed an act defined as sexual battery" on a child "by placing his penis in union with . . . and/or penetrating the vagina of A.M. (a minor) with his penis." Galindez claims that because the charge was made in the alternative (and therefore the jury did not specifically find that penetration was involved), the trial court could assess only 40 points for victim injury. . . . *[F]or purposes of our harmless error analysis the issue is whether the failure to have the jury make the victim injury finding as to Count I contributed to the conviction or sentence—in other words, whether the record demonstrates beyond a reasonable doubt that a rational jury would have found penetration.*
> At trial the young victim, then pregnant by Galindez, testified that she and Galindez engaged in sexual intercourse on multiple occasions over a period of several months. Galindez's confession confirming these facts, including his admission that they repeatedly had sexual intercourse, was admitted at trial. Finally, Galindez's defense at trial was that the twelve-year-old victim consented. Thus, Galindez did not dispute the facts of the sexual relationship at trial, and he did not contest them at resentencing, either.

955 So. 2d at 523-24 (first alteration in original) (emphasis added) (citation omitted). We concluded that "[i]n light of the clear and uncontested record evidence of penetration," the error was harmless beyond a reasonable doubt. *Id.* at 524.

Based upon *Galindez*, the applicable question in evaluating whether an *Alleyne* violation is harmful with respect to section 775.082(1)(b) is whether the failure to have the jury make the finding as to whether a juvenile offender actually killed, intended to kill, or attempted to kill the victim contributed to his sentence— stated differently, whether the record demonstrates beyond a reasonable doubt that a rational jury would have found the juvenile offender actually killed, intended to kill, or attempted to kill the victim. *See Galindez*, 955 So. 2d at 523.

## Application

Based upon our review of the record in this case, the *Alleyne* violation cannot be deemed harmless. Unlike the defendant in *Galindez*, who did not dispute during trial that he and the victim engaged in sexual intercourse, Williams disputed both that he killed Brookins and that he was a willing participant in the murder. There was sharply conflicting evidence in the form of Williams's statements during his interrogation that he hoped Brookins would live, and the testimony of the jailhouse informant who painted Williams as both an active participant in the plan to lure Brookins to the trap house and the actual killer.

In the light least favorable to Williams, the evidence reflects that (1) Parker called Williams and informed him that she had been robbed, and she believed Brookins "set her up"; (2) within a few hours of that call, Williams sent Parker a text message stating, "i cant talk cuz im round 2 many people but jus chill bae ima take care of yo problems jus give me the greenlight"; and (3) according to the informant, Williams helped devise the plan to lure Brookins to the trap house on the pretense of having gold teeth created and actively participated in the crimes against Brookins. This included striking Brookins with a firearm that Williams brought to the house; demanding the location of the safe while Brookins pleaded, "It doesn't have to be like this. I thought we was better than this"; sending Parker to purchase duct tape; binding Brookins with the tape; waiting until the early morning hours to move Brookins to avoid being seen; placing Brookins in the trunk of a vehicle, bound and beaten but still alive; driving the vehicle to St. Johns County with Henderson in the passenger seat while Parker followed in a separate vehicle; wiping down the vehicle; and shooting Brookins twice.

However, the jury could have rejected the informant's testimony on the basis that he was a jailhouse informant who received a reduced sentence in exchange for his testimony, because certain aspects of his testimony did not make sense,[10] or

10. The informant testified that Henderson, Parker, and Williams acquired approximately $300,000 from Brookins's safe and divided it equally. According to the informant, Williams used a portion of his third of the money to purchase a

because the informant had been previously housed with codefendant Henderson, who, according to the informant, assisted him with having a criminal charge dropped. Nonetheless, Williams's interrogation still paints an incriminating picture. Williams admitted the following: (1) when he arrived at the trap house, Henderson gave him a firearm; (2) once he saw Brookins, who was unconscious from being beaten, he stepped outside and covered a portion of his face with a shirt;[11] (3) he told Brookins, "Just cooperate, bro, and . . . you won't die"; (4) he struck Brookins with his hands; (5) while at the trap house, and after Brookins had been severely beaten and duct-taped, he smoked marijuana that had been removed from Brookins's pocket; (6) he rode with Parker to the location where Brookins had parked a vehicle and then drove that vehicle back to the trap house; (7) he removed a scooter from the trunk of that vehicle to make room for Brookins; (8) for approximately forty-five minutes, he drove the vehicle with Brookins in the trunk to the rural road in St. Johns County while Parker and Henderson rode in a separate vehicle; and (9) upon arrival, he could hear Brookins in the trunk screaming.

---

house for his mother and a vehicle. However, the informant testified immediately afterwards that Williams's mother was evicted from the house for "falling behind in rent."

11. When the detective suggested that Williams did this because he and Brookins knew each other and he "felt bad," Williams agreed.

It can be argued that a juvenile who admits to participating in a kidnapping and homicide to this extent intended for the victim to be killed. The jury found Williams guilty of kidnapping Brookins; however, as previously discussed, intent to kidnap does not equal intent to kill, and the jury was instructed that to find Williams guilty of felony murder, the State need not prove Williams had a premeditated design or intent to kill. The jury could have believed that Williams intended to kidnap Brookins in an attempt to recover money or the drugs that had been stolen from Parker, a woman with whom he was having a sexual relationship, but that he neither shot Brookins nor intended for him to die. A review of the interrogation recording reflects that Williams stated he hoped and believed Brookins would live.[12] Further, during closing statements, defense counsel argued that the fact that Williams placed a shirt over a portion of his face after seeing Brookins at the trap house demonstrated he believed Brookins would not be killed:

> Well, if he knows that Mr. Brookins is going to be murdered,
> why would you cover your face? He's the only person there that
> could say anything about [Williams] being involved. You don't cover

---

12. Williams made statements such as "[H]onestly, I was hoping that he would live," "The plan was that . . . they was going to leave him alive," "They telling me now at this point that they going to drop him off and leave him in the trunk . . . . [There's] so much relief just going off in my body. I'm, like, okay, so he's gonna live . . . . But little do we found out, when we get there [Henderson] kills him," and "I was getting out of the car, and I heard [Brookins] still screaming or whatever. And I was, like, okay, he's still living. So I was happy at that point . . . that he wasn't dead."

your face if you know somebody's going to be murdered. That doesn't make sense.

Because the record fails to demonstrate beyond a reasonable doubt that a rational jury would have found that Williams actually killed, intended to kill, or attempted to kill Brookins, the *Alleyne* violation here was not harmless.

## Remedy

Williams suggests two alternative remedies for the *Alleyne* violation that occurred: empanel a new jury to make the requisite finding or resentence him pursuant section 775.082(1)(b)2., the applicable provision where there is a finding that the juvenile offender did not actually kill, intend to kill, or attempt to kill the victim. Our precedent in the context of *Apprendi/Blakely* violations demonstrates the latter is the appropriate remedy. In *Plott v. State*, 148 So. 3d 90, 95 (Fla. 2014), the circuit court during resentencing imposed upward departure sentences without a jury determining the applicable factual basis for the departure, in violation of *Apprendi* and *Blakely*. We described the remedy as follows:

> We remand to the district court for the application of a harmless error analysis under *Galindez*, and, if it is determined not to be harmless, *to remand the case for resentencing*.

*Id.* (emphasis added).[13]

---

13. On remand, the Second District determined the error was harmless. *See Plott v. State*, 165 So. 3d 33, 34 (Fla. 2d DCA 2015).

- 23 -

Because *Alleyne* derives from *Apprendi*, and resentencing is the proper remedy where a harmful *Apprendi/Blakely* violation has occurred, *see Plott*, 148 So. 3d at 95, we hold resentencing is the appropriate remedy for an *Alleyne* violation that is not harmless. Here, because the record fails to demonstrate beyond a reasonable doubt that a rational jury would have found Williams actually killed, intended to kill, or attempted to kill Brookins, he is entitled to be resentenced under section 775.082(1)(b)2.

The dissent questions whether this remedy is necessary or appropriate, and suggests that nothing precludes the empaneling of a jury to make the factual determination. We are, however, hesitant to wade into "a thicket of potential and thorny double jeopardy issues." *United States v. Pena*, 742 F.3d 508, 518 (1st Cir. 2014). In *Pena*, a case that involved guilty pleas to drug offenses, the United States conceded an *Alleyne* error occurred that was not harmless, but requested that a "sentencing" jury be empaneled to make a factual determination as to an element that, if found beyond a reasonable doubt, would authorize an enhanced mandatory minimum sentence. *Id.* at 509, 514.[14] In declining this request, the United States Court of Appeals for the First Circuit first noted:

---

14. The element was death or serious bodily injury resulting from use of the drugs. *Id.* at 509. The defendant in *Pena* entered "a straight guilty plea to drug dealing but not to 'death resulting.'" *Id.*

Decisions of the Courts of Appeals after *Alleyne* have remanded for resentencing by the court. We are not aware of any court that has been confronted with facts analogous to those here. But in at least nine circuit court cases that have found reversible *Alleyne* error, the sentence was vacated and remanded for resentencing by the district judge. We are aware of no case, and the parties have cited none, remanding for use of a sentencing jury after a reversible *Alleyne* error.

*Id.* at 517-18 (footnote omitted). Further, with respect to double jeopardy concerns, the First Circuit stated:

If this conviction were final, the constraint of double jeopardy would be clearer. It is also true that those double jeopardy safeguards do not usually apply to resentencing. But the effect of *Alleyne* and its predecessors is to preclude certain sentences from being imposed unless the elements supporting them have been proven to a jury beyond a reasonable doubt. The Supreme Court has not yet dealt with the double jeopardy issues in this context, much less in these transition cases where what was once thought to be a sentencing issue has been recognized instead to be an element of a crime.
. . . .
The prosecution's proposed course of action here seeks to . . . obtain the benefit of the plea's admissions to the essential elements of the two drug crimes, which are also among the essential elements . . . of the aggravated "death resulting" crime. Indeed, the prosecution's brief is explicit that the sentencing jury would take the admissions of guilt from the plea for the other elements and then decide only the "death resulting" issue. Under the doctrine of constitutional avoidance, we do not decide the double jeopardy issues associated with the government's request, but note them and avoid them.

*Id.* at 518-19 (citation omitted). In light of the constitutional concerns presented by the *Pena* court with respect to empaneling a jury where a harmful *Alleyne* error has occurred, we conclude that resentencing pursuant to section 775.082(1)(b)2. is the more prudent course.

**CONCLUSION**

Based upon the foregoing, we answer the certified question by holding that

*Alleyne* requires the jury to make the factual finding under section 775.082(1)(b) as

to whether a juvenile offender actually killed, intended to kill, or attempted to kill

the victim.  Although we conclude that *Alleyne* violations are subject to harmless

error review, the violation here cannot be deemed harmless.  Therefore, Williams

is entitled to resentencing under section 775.082(1)(b)2.  We quash the decision of

the Fifth District in *Williams II* and remand to the district court for further

proceedings consistent with this opinion.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, J., concurs in part and dissents in part with an opinion, in which
POLSTON and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND,
IF FILED, DETERMINED.

CANADY, J., concurring in part and dissenting in part.

I agree with the majority that under *Alleyne v. United States*, 570 U.S. 99

(2013), the factual findings provided for in section 775.082(1)(b), Florida Statutes

(2016), must be made by the jury and that the absence of such jury findings in this

case requires reversal of the sentence imposed under section 775.082(1)(b)1. and

resentencing in the trial court.  But I dissent from the majority's direction

regarding the remand, which requires imposition of the less severe sanction

available under the statute. Because the issue of the remedy on remand has not been briefed in this case, I would simply direct remand for resentencing rather than preclude jury proceedings that might result in imposition of the more severe sentence under the statute.

Although we have not had the benefit of briefing on this issue, I am deeply skeptical that the direction given by the majority precluding jury proceedings is either necessary or appropriate. As the majority opinion reflects, Williams's counsel earlier suggested impaneling a jury to make the factual determination provided for in section 775.082(1)(b). And the majority has pointed to no basis in our law establishing that suggestion to be inconsistent with any legal requirement. The majority's reliance on *Plott v. State*, 148 So. 3d 90 (Fla. 2014), is entirely unwarranted. In *Plott*, we simply directed that the district court remand for resentencing if it determined that the *Apprendi*/*Blakely* error was not harmless. 148 So. 3d at 95. Our opinion is silent concerning whether a jury should be impaneled to consider the factual determinations necessary to support an upward departure sentence on remand.

The majority's direction restricting the proceedings on remand is inconsistent with the general rule "that a resentencing must proceed 'as an entirely new proceeding,' and that a 'resentencing should proceed *de novo* on all issues bearing on the proper sentence.' " *State v. Collins*, 985 So. 2d 985, 989 (Fla. 2008)

(citation omitted) (quoting *Wike v. State*, 698 So. 2d 817, 821 (Fla. 1997), and *Teffeteller v. State*, 495 So. 2d 744, 745 (Fla. 1986)).  It necessarily follows from that rule that if a jury determination is required regarding facts bearing on the sentence in a resentencing proceeding, the State should have the opportunity to prove those facts to a jury.

Notably, the majority's decision on this point seems irreconcilable with the manner in which we are treating the death cases that have been reversed based on the majority's decision in *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017).  In *Hurst*, we "remand[ed] for a new penalty phase proceeding."  202 So. 3d at 69.  And we have summarily rejected as "without merit" claims based "on double jeopardy and due process grounds" that the State "is precluded from seeking the death penalty" in *Hurst* resentencing proceedings. *Hurst v. State*, No. SC17-302, 2017 WL 1023762, at *1 (Fla. Mar. 16, 2017) (unpublished).  Although we did not explain our conclusion, the Arizona Supreme Court has provided an extensive constitutional analysis for its holding that double jeopardy did not bar death sentence proceedings after reversal of death sentences for *Ring* errors.  *See State v. Ring*, 65 P.3d 915, 928-32 (Ariz. 2003), *on remand from Ring v. Arizona*, 536 U.S. 584 (2002).  Affording the State an opportunity to obtain death sentences in new jury proceedings in the death cases is inconsistent

with the majority's decision here denying the State an opportunity to obtain the more severe sentence available under section 775.082(1)(b).

Unable to identify any support for its position in our jurisprudence, the majority cites the decision of the First Circuit in *United States v. Pena*, 742 F.3d 508 (1st Cir. 2014), and relies on the invocation—more aptly, incantation—in that decision of "the doctrine of constitutional avoidance." Majority op. at 25 (quoting *Pena*, 742 F.3d at 519). The majority announces that it is "*hesitant* to wade into 'a thicket of potential and thorny double jeopardy issues.' " *Id.* at 24 (emphasis added) (quoting *Pena*, 742 F.3d at 518). Without deciding that double jeopardy doctrine actually requires that the less severe sentence be imposed on remand, the majority mandates imposition of that less severe sanction because it asserts there *might be* a double jeopardy problem with the more severe sentence.

But this use of the constitutional avoidance doctrine is not consistent with how we have understood and applied that doctrine. Under the doctrine, hesitancy and doubt alone are not a ground for decision. In the absence of a legal basis that otherwise resolves the point at issue, the Court must confront and decide the constitutional question—assuming that issue has been properly presented for decision. Yet here the majority does not base its decision on an alternative ground that avoids the constitutional issue. *See Singletary v. State*, 322 So. 2d 551, 552 (Fla. 1975) (relying on "the settled principle of constitutional law that courts

- 29 -

should not pass upon the constitutionality of statutes if the case in which the question arises may be effectively disposed of on other grounds").  Nor does the majority avoid a potential constitutional problem by adopting a statutory interpretation that presents no constitutional issue rather than another interpretation that is constitutionally problematic.  *See State v. Giorgetti*, 868 So. 2d 512, 518 (Fla. 2004) (recognizing "the canons of statutory construction requiring us to interpret the statutes in a way as to avoid any potential constitutional quandaries").  Instead, the majority's decision is planted firmly in the air.

The constitutional avoidance doctrine is "a principle of judicial restraint."  *In re Holder*, 945 So. 2d 1130, 1133 (Fla. 2006); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").  The doctrine recognizes that the judicial branch should only invalidate legislation— thereby thwarting the action of a coordinate branch of government—when no other course of action is properly available.  But the majority here has turned the doctrine on its head.  Rather than avoiding judicial action that thwarts legislative action, the majority has deployed the doctrine to preclude the opportunity to carry out the legislative purpose embodied in section 775.082(1)(b).

In applying this misshaped version of the constitutional avoidance doctrine, the majority strains to find doubt and simply ignores the elephant in the room. It fails to explain how summary rejection of double jeopardy claims in the *Hurst* context was appropriate if this case now presents "a thicket of potential and thorny double jeopardy issues." No basis is stated by the majority—and no basis is apparent—for distinguishing the double jeopardy implications of a resentencing following reversal for an *Alleyne* error from the implications following reversal for an *Apprendi*, *Blakely*, *Ring*, or *Hurst* error—all of which involve failing to present an issue to the jury that must be decided by the jury.

POLSTON and LAWSON, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

Fifth District - Case No. 5D16-1348

(St. Johns County)

Valarie Linnen, Atlantic Beach, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, Wesley Heidt, Bureau Chief, and Pamela J. Koller, Assistant Attorney General, Daytona Beach, Florida,

for Respondent