DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**GUSTAVO ENAMORADO DUBON,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D18-1867

[April 22, 2020]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Barbara R. Duffy, Judge; L.T. Case No. 12-17955-CF10A.

Carey Haughwout, Public Defender, and David John McPherrin, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Deborah Koenig, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Gustavo Enamorado Dubon appeals his convictions and concurrent life sentences for first-degree murder and armed kidnapping.

Appellant was charged by indictment with the first-degree murder and armed kidnapping of the victim, Francisco Cuevas. He was convicted after a jury trial and sentenced to concurrent terms of life in prison. We affirm the convictions in all respects, but remand to the circuit court to conduct further competency proceedings.

**Facts**

*The Victim's Disappearance and Death*

The victim and Hagen Christ were business partners in Pyro Industries, a firm that built commercial kitchen hoods. The victim handled the business side of the operation, while Christ was the shop manager. The

victim had a falling out with Christ and was planning to dissolve the partnership by the end of 2007.

Before the victim's disappearance, the victim's mother and sister typically would talk to him several times a week. The last time either spoke to him was on November 2, 2007. When they did not hear from him for several days, they went to the Coral Springs Police Department and reported him missing on November 6, 2007.

A surveillance video shows that on the morning of November 3, 2007, the victim entered a Dunkin' Donuts in a shopping plaza near his home in Coral Springs. That same day, the victim dropped off his dog to be groomed at a "puppy spa" in the same plaza. The victim never returned for his dog.

Shortly after the victim went missing, Christ withdrew over $50,000 from a Pyro Industries bank account.

About five months after the victim's disappearance, a worker was removing trees in an area of Palm Beach Gardens near the Beeline Highway and the Florida Turnpike. He came across a welded steel box and moved it out of the way with his excavator, leaving a rip in the box. The box emitted a strong odor, prompting him to call the police.

The box contained a human head barely attached to a shoulder, a portion of a chest, and a left foot.

The medical examiner determined that the decedent suffered four lacerations consistent with blows to the head and a number of saw cuts though his jawbone. Additionally, the decedent's throat "was all cut up." The medical examiner could not tell whether the sharp injuries occurred before or after the decedent's death.

A forensic anthropologist testified that the only instance of antemortem trauma that she could discern from the body was "a fracture to the nose and then also a deviated septum." The forensic anthropologist further testified that postmortem trauma "was the bulk of the trauma that was evident on the body" and that "this trauma was sharp force trauma that was consistent with a power saw that had been used for dismemberment."

In July 2009, the medical examiner used dental records to identify the remains as belonging to the victim.

Law enforcement searched the premises of Pyro Industries in March 2010 and again in April 2010, finding blood on the floor and around the area close to a welding machine. No DNA evidence was gathered from the scene. Forensic testing revealed that an attempt had been made to clean up the blood. Law enforcement also found a reciprocating saw inside the shop. A forensic specialist testified that the cleanup was "consistent with a human being dismembered with a reciprocating saw" on a table in the shop.

Within a week after one of the search warrants was served, Christ left the United States and went to Peru.

*News Report*

In July 2010, a Univision television program called "Aqui y Ahora" aired a segment about the victim's murder, featuring interviews with the victim's mother, the victim's sister, and an officer from the Palm Beach Gardens Police Department (the "Gardens officer"). The segment, which was translated from Spanish into English for the jury, discussed the key details of the case:

- A team of workers cutting down trees in South Florida discovered "a mysterious soldered metal box" in April 2008.

- When officers of the Palm Beach Gardens Police Department arrived at the scene, they found that "inside the box was a head, [the] upper part of the torso and a left foot."

- The victim was living in Coral Springs and last spoke with his mother on November 2, 2007.

- The victim's family reported him missing on November 6, 2007, but Coral Springs Police did not take them seriously.

- The victim's family obtained a security video showing the victim buying coffee at a coffee shop in a plaza near his home on Saturday, November 3, 2007.

- That same morning, the victim left his dog at a pet salon located a few doors away from the coffee shop, but never showed up to pick up the dog.

- The victim's family believed the victim was heading towards his company's business, Pyro Industries, as the victim had

- 3 -

previously told them that he would meet with his partner, Hagen Christ, every Saturday at 8:30 a.m.

- • The victim's family documented suspicious activities in the company, including that Christ had withdrawn $58,000 only a few days after the victim's disappearance.

- • After the Palm Beach Gardens Police Department released a reconstructed drawing of how the victim might have looked, a detective in Coral Springs contacted them and said that the sketch resembled a man named Francisco Cuevas, who had been reported missing on November 6, 2007.

- • Police found traces of washed-away blood at the Pyro Industries shop.

- • The victim's family was "convinced he was murdered at the shop."

During the segment, viewers were shown the metal box, the wooded area where it was found, a communication tower near the wooded area, the plaza where the victim was last seen, the victim's dog, the Pyro Industries building, and a photograph of Christ.

The reporter asked viewers to contact the Palm Beach Gardens Police Department at the number on the screen if they had any information about the case, and noted that the family was offering a $20,000 reward to any person who could provide information resulting in a conviction.

*Appellant's Contact with Police in 2010*

About a week or two after the "Aqui y Ahora" segment aired, appellant sent a text message to the phone number provided on the show, telling the police that the victim's business partner was involved in the murder and that the rest of the victim's remains were in the same area where the metal box was found.

In October 2010, the Gardens officer and a detective met with appellant in New Orleans. Appellant told the officers that he met two Hispanic males at a bar and that they paid him $1,000 to send the text message.

*Appellant's Meeting with the Victim's Family*

The next month, appellant met with the victim's mother and sister in New Orleans. Appellant told them that the victim was kidnapped on the morning of November 3, 2007, and was murdered that night. Appellant did not tell them where the kidnapping occurred. Appellant said that two or three people were involved, including a man named Marvin Reyes and another named Velazquez. Appellant explained that he was at a nightclub when the "Aqui y Ahora" show aired, and that people started talking about how two men in the club were involved in the murder. Those two men then asked appellant to contact the show because they were upset that the person who paid to have the victim killed "had not paid them everything."

Neither the victim's sister nor his mother provided appellant with details regarding the victim's death. Instead, appellant spent "over an hour and a half" giving details. Appellant did not admit involvement in the murder and did not ask about the reward money.

*Appellant's Detention by Immigration Authorities in August 2012*

Appellant was deported in June or July 2012. When appellant came back to the United States in August 2012, he was picked up by immigration authorities and held at a detention center in Louisiana.

*Appellant's Phone Conversations with a Palm Beach Gardens*
*officer in October 2012*

In October 2012, the Gardens officer received a call from appellant's wife, which prompted him to have two phone conversations with appellant over the next several days.

In the first conversation, appellant said that a Hispanic male was involved in the victim's murder, but appellant did not want to supply a name.

In the second conversation, appellant claimed that he "had no involvement in the actual homicide," but admitted that he was present, that he acted as a lookout, and that a man named Gordo, who had been hired by Christ, paid him between $6,000 and $7,000 for his participation. During these conversations, appellant never asked about the $20,000 reward.

*Appellant's Statement at the Louisiana Detention Center*

Later that month, the Gardens officer traveled to the immigration detention center in Louisiana to meet with appellant. Appellant again stated that Christ hired Gordo to kill the victim so that he could keep the business. Appellant added that he, Gordo, and another male kidnapped the victim from the plaza and put him in the back of a van before he was murdered and cut into pieces. Appellant also claimed that more of the victim's body parts were in the same area where the metal box was found. Appellant offered to show the Gardens officer the area where the victim's body parts were buried. Appellant also said that if the police took him to the plaza, he could show them exactly what happened.

Following this conversation, appellant was moved to an immigration detention center in Miami.

*Appellant's Field Trip to Locations Connected with the Murder*

On November 1, 2012, multiple officers, including the Gardens officer, picked up appellant in Miami and drove northbound on the Turnpike so that appellant could show them where the victim's body was dumped. The Gardens officer gave the following account of the trip.

During the ride, appellant continually asked, "Are we there yet?" The Gardens officer responded, "You tell me when we get there." As they approached the Beeline Highway, appellant noticed a communication tower and said, "We're here." Appellant added that "this is where we dumped the body." They exited the turnpike and appellant directed them to the area where the metal box had been located.

After they stopped, appellant showed them an area of a lake that was near a set of palm trees, and told them that the remaining body parts had been dumped there in plastic bags.[1]

From there, the group drove south to Coral Springs and parked across the street from the victim's house. The Gardens officer asked appellant, "Do you recognize anything around here?" Appellant said that he recognized "those houses across the street" because they surveilled the victim for a couple of days.

---

[1] The police later excavated that portion of the lake, but the remaining body parts were not found.

Appellant then directed the officers to the shopping plaza, which was three-to-five minutes away. Appellant said that the color of the plaza was different and that certain buildings had been added. The Gardens officer later learned that the plaza had been painted and that the buildings were added after 2007. Appellant also asked, "Where's the puppy spa?" Up until that point, the Gardens officer had assumed that the puppy spa was in a different plaza. An officer from Coral Springs then explained that "it's not here no more." Appellant then correctly mentioned that one of the buildings in the plaza had a drive-thru window, even though the drive-thru could not be seen from where they were parked.

From the plaza, the group drove about 35–40 minutes to the area where Pyro Industries was once located. The Gardens officer asked appellant whether he recognized anything there. Even though there were no signs identifying the business, appellant pointed to the building that Pyro Industries had previously occupied.

*Appellant's Recorded Statement*

On November 6, 2012, the Gardens officer and other investigators conducted a recorded interview of appellant.

Appellant stated that in 2007, when he was 16 years old, he came to the United States from Honduras and lived with a cousin in Houston, Texas. Appellant went to a Home Depot and met a man named Varela, who was looking for construction workers. Appellant initially worked for Varela for about two weeks. Varela would always mention that he had a boss in Miami named Gordo who had lots of work involving "dirty" jobs.

Appellant later moved to New Orleans, but eventually called Varela and told him, "Hey, listen I have no work." Varela offered appellant $7,000 or $8,000 for one or two weeks of work in Miami, but would not tell appellant the nature of the work. Varela and another man picked appellant up and headed to South Florida.

Once in South Florida, they met Gordo and others at a restaurant. Varela told appellant that they were going to kill the victim because of problems at the victim's welding company.

Gordo said that he would pay them each about $10,000 on behalf of Christ.

On a Friday or Saturday, they waited for the victim "at the stores." Varela said that the victim was at one of the stores with a dog. When the

victim came outside, Gordo and another man (Vasquez) threw the victim in a van, while appellant grabbed one of his legs. Gordo then blindfolded the victim. Varela was driving.

Inside the van, "they" (apparently referring to Gordo and Vasquez) cut the victim's neck and stabbed him in the stomach, causing him to bleed to death. Gordo said he was going to cut the victim to pieces because Christ "didn't want any trace of him." The group drove to the Pyro Industries shop. The victim was already dead when they arrived. Appellant kept watch, but never went inside the shop. The victim's head was placed in a box and his other remains were placed in three plastic bags. They put the victim's remains in the van and drove to a place in Palm Beach County where there are lakes. Appellant helped dig a hole to dispose of the remains. Appellant was told that Gordo was going to bury the box separately. Gordo paid appellant $7,000.

Appellant said that he was cooperating because he wanted to see his son and stay in the country.

### Appellant's Letter

At the outset of the recorded interview, appellant gave the Gardens officer a letter that he had written. In it, appellant wrote that he was "being accused of kidnapping because of participating in the death of [the victim]," but that he knew he was innocent and was "not capable of committing a suicide [sic] like this." Nonetheless, appellant's letter went on to provide an account of his participation in the victim's kidnapping and murder. The story appellant provided in the letter was similar to the one he told in his recorded statement, though there were some minor differences between the two accounts.

### Follow-Up Investigation

The police attempted to follow up on the people appellant named as accomplices, but were unable to find anyone with those names who matched appellant's descriptions of them.

### Defense Case – Alibi Witnesses

Appellant presented an alibi defense, claiming that he was in Honduras at the time of the murder.

Appellant's cousin testified that he saw appellant in Honduras on a daily basis from the beginning months of 2007 through April 2008. The

cousin, who worked as a civil engineer in Honduras, explained that he supervised the construction of a hospital in Honduras between April 2007 and April 2008, and that appellant worked on the project from beginning to end. The cousin also testified that appellant participated in his wedding in August 2007, that appellant came to his house to see his newborn son in late March or early April 2008, and that appellant attended a birthday party at his house in late April 2008. According to the cousin, appellant left Honduras in May 2008.

Similarly, the project manager for the hospital construction project in Honduras testified that she hired appellant in late April 2007 to supervise the warehouse, and that she saw him every day from May 2007 until he left the company in April 2008. The project manager explained that she and appellant's cousin were merely coworkers, that she did not see him for nearly ten years after 2008, and that he contacted her over Facebook in 2017 because appellant's attorney wanted to talk to her.

*Defense Case – Appellant's Testimony*

Appellant testified that he lied to police about being involved in the victim's murder and that he was in Honduras when the crime occurred. Appellant explained that he lied to obtain reward money and also to avoid deportation.

Appellant said that he worked on the hospital construction project in Honduras from April 2007 until the end of April 2008, that he attended his cousin's wedding in August 2007, and that he was at a relative's birthday party in April 2008. Appellant first arrived in the United States in June 2008, having left Honduras the previous month.

Appellant claimed that in 2010 he watched seven or eight minutes of the "Aqui y Ahora" segment concerning the victim's murder. Hoping to obtain the $20,000 reward, which would have allowed him to "live like a king" in Honduras, appellant sent a text to police in which he posed as a witness. When officers questioned him in 2010, appellant eventually told them that he knew nothing about the victim's disappearance. The officers threatened appellant with deportation, so he started giving them false statements, telling them that he heard some people talk about the disappearance.

Appellant also met with the victim's family and insinuated that he knew something about the murder.

In 2012, after appellant was detained by immigration authorities, appellant lied to the police about his involvement in the murder because he believed that being a witness would allow him to stay in the United States. The police told appellant that they wanted to use him as a witness against the victim's business partner. The police told him that they wanted to help him. The police gave appellant the details of the case, and appellant would repeat the same things back to them.

Appellant testified that it was the police who led him to the lake where the metal box was found, and that he lied to the police when he told them where the remainder of the body could be found. Appellant also said that he did not lead the police to the shopping center, but rather they took him. Appellant claimed that the things he said in his letter to police were lies.

*Convictions and Sentences*

The jury found appellant guilty of first-degree murder and armed kidnapping as charged. Appellant was sentenced to concurrent terms of life in prison.

**Analysis**

**The trial court did not abuse its discretion in sustaining the State's relevance objections to certain photographs of appellant in Honduras prior to the time of the murder**

During appellant's cousin's testimony, defense counsel sought to introduce a photograph showing appellant at a construction site and three photographs showing him at a wedding. The cousin testified that the photograph of appellant at the construction site was taken in May or June 2007, and that the three other photographs were taken at the cousin's August 2007 wedding.

The trial court sustained the State's relevancy objections to the photographs, concluding that the photographs were "not relevant in any way."

The trial court admitted a photograph of appellant which, according to the cousin's testimony, was taken at the cousin's stepfather's birthday party in Honduras on April 25, 2008.

Appellant argues that the trial court abused its discretion in excluding photographs depicting him in Honduras before the victim's disappearance. He contends that the photographs tended to corroborate his alibi defense

and that "their introduction would have provided the jury in tangible form what appellant and others testified to."

The State responds that the photographs were not relevant because they were taken months before the murder "and did not, in any way, prove that Appellant was in Honduras at the time of the murder."

*Discussion*

The question raised involves the relevance of the photographs. "A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion." *Sexton v. State*, 697 So. 2d 833, 837 (Fla. 1997).

Relevancy is a prerequisite to the admissibility of evidence. *Wright v. State*, 19 So. 3d 277, 291 (Fla. 2009). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2017). "All relevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. (2017).

In a criminal case, "[i]f there is any possibility of a tendency of evidence to create a reasonable doubt, the rules of evidence are usually construed to allow for its admissibility." *Vannier v. State*, 714 So. 2d 470, 472 (Fla. 4th DCA 1998).

For example, in *Vannier*, we reversed the defendant's murder conviction, holding that the trial court erred in excluding letters evidencing the decedent's suicidal intent where the defense at trial was that the decedent killed herself. *Id.* at 471–72.

Similarly, in *Dean v. State*, 916 So. 2d 962, 964 (Fla. 4th DCA 2005), we reversed the defendant's robbery conviction, holding that the trial court erred in excluding a pawn slip containing someone else's name and a fingerprint that did not belong to the defendant. We reasoned that the pawn slip was relevant to the defendant's "theory of defense that he was not the person who robbed the victim," as the evidence had "the possibility of a tendency to create a reasonable doubt in the jury's mind" as to whether he committed the crime. *Id.*

Here, unlike *Vannier* and *Dean*, the photographs at issue were not relevant. The photographs were taken months before the murder and did not, even indirectly, tend to prove that appellant was in Honduras at the time of the murder. Even when considered in conjunction with the testimony of the defense witnesses, the photographs merely proved that

appellant was in Honduras months before the murder occurred. At best, the photographs' limited probative value was to corroborate minor, tangential details of the alibi witnesses' testimony. Because the photographs did not tend to prove or disprove a material fact, the trial court did not abuse its discretion in excluding them as irrelevant.

**The trial court did not abuse its discretion by overruling appellant's objection to a portion of the State's summation that properly argued the credibility of the witnesses**

*Additional Facts*

During closing argument, the prosecutor challenged the credibility of appellant's alibi witnesses:

> You weigh the State's case with the defense case. Do I believe his cousin, who clearly has an interest again going to weighing the evidence, back to weighing the evidence. His cousin. It's family. And then gets [the project manager]. Come. Come with me to the States. She testified.

At that point, defense counsel objected without stating any grounds for the objection.

Appellant argues that the trial court abused its discretion in overruling his objection to the prosecutor's comment in closing. Appellant claims that the prosecutor's comment improperly suggested that "appellant's cousin was lying for him and he enlisted the help of another to do the same."

*Discussion*

A trial court's rulings on comments made during closing argument are reviewed for an abuse of discretion. *Jackson v. State*, 89 So. 3d 1011, 1018 (Fla. 4th DCA 2012).

Wide latitude is permitted in closing argument. *Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982). "Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments." *Id.* "A prosecutor's argument should be examined in the context in which it is made." *Lubin v. State*, 963 So. 2d 822, 824 (Fla. 4th DCA 2007). "[A] comment standing alone may be viewed as inappropriate, but when considered within the context of the entire closing argument and the record, it may be a fair comment." *Rivera v. State*, 840 So. 2d 284, 287 (Fla. 5th DCA 2003).

Here, as a preliminary matter, this issue is unpreserved because defense counsel did not state a legal ground for his objection to the prosecutor's comment. *See Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985) ("In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved."). Therefore, this court's review is limited to whether fundamental error occurred.

Not only was the prosecutor's argument not fundamental error, it was not error at all. An attorney may argue the credibility of witnesses in closing argument, so long as the argument is based on the evidence presented at trial. *Jackson*, 89 So. 3d at 1018. The prosecutor's comment was a permissible argument that the jury could use the "weighing the evidence" instruction to determine that appellant's alibi witnesses were not credible. The prosecutor merely argued that appellant's cousin had an interest in how the case was decided because he was family, and that he got the project manager to come with him to the United States to testify. The prosecutor's argument was based on an application of the "weighing the evidence" instruction to the evidence at trial. *See* Fla. Std. Jury Instr. (Crim.) 3.9 (stating that one of the factors the jury should consider when "weighing the evidence" is whether the witness had "some interest in how the case should be decided").

The prosecutor never stated that the alibi witnesses "concocted" their story. *Compare Evans v. State*, 62 So. 3d 1203, 1204 (Fla. 4th DCA 2011) (holding that fundamental error occurred where the prosecutor baselessly argued that the defendant asked the witness to "hook me up" on the stand, and that they had "three weeks to think of something" and "concocted" the story). Nor did the prosecutor otherwise suggest that appellant "suborned perjury" or that the defense witnesses "manufactured evidence." *Compare Berkowitz v. State*, 744 So. 2d 1043, 1045 (Fla. 4th DCA 1999) ("A suggestion that the defendant suborned perjury or that a defense witness manufactured evidence, without a foundation in the record, is completely improper.") (internal quotation marks omitted).

Because the prosecutor's comment was a permissible argument concerning the credibility of the defense witnesses, the trial court did not abuse its discretion in overruling the objection.

**The opinion of the Gardens officer concerning the application of the law of principals did not rise to the level of fundamental error**

*Additional Facts*

During appellant's cross-examination of the Gardens officer, defense counsel brought out that appellant's letter to police claimed he was innocent and was not a murderer.

On redirect, the Gardens officer testified that appellant told him in the interview that he had participated in the homicide as a lookout and had grabbed the victim's foot to throw him in the van. The following exchange then took place:

> Q   And [defense counsel] just asked you that isn't it true that the defendant in this case said, "I'm not a murderer," correct?
>
> A   Yes.
>
> Q   He asked you that?
>
> A   Yes, ma'am.
>
> ***Q   Can you still be a principal to murder by what he did?***
>
> ***A   Yes, ma'am.***
>
> Q   Thank you.
>
> [DEFENSE COUNSEL]:  Can you still be -- Objection.
>
> THE COURT:  Overruled.

On appeal, appellant argues that the trial court abused its discretion in allowing a police officer to opine that, based upon appellant's statements, appellant was a principal to murder.

*Discussion*

As an initial matter, this issue was unpreserved because defense counsel did not state a legal ground for his objection to the prosecutor's question. *See Tillman*, 471 So. 2d at 35. Therefore, this court's review is limited to whether fundamental error occurred.

Florida law prohibits a witness from rendering "an opinion which applies a legal standard to a set of facts." *Cty. of Volusia v. Kemp*, 764 So. 2d 770, 773 (Fla. 5th DCA 2000). Similarly, "[a]n opinion as to the guilt or innocence of an accused is not admissible." *Glendening v. State*, 536 So. 2d 212, 221 (Fla. 1988). "Florida statutory law excludes such opinion testimony, regardless of its relevance, on the grounds that its probative value is substantially outweighed by unfair prejudice to the defendant." *Battle v. State*, 19 So. 3d 1045, 1047 (Fla. 4th DCA 2009) (citation and internal quotation marks omitted).

What is more, "there is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt." *Martinez v. State*, 761 So. 2d 1074, 1080 (Fla. 2000). For example, it is improper for a police officer to testify that a case does not involve self-defense. *Thompson v. State*, 257 So. 3d 573, 578 (Fla. 1st DCA 2018). Likewise, it is error to permit an officer to give testimony describing the defendant's actions toward the accuser as "battery," as such testimony essentially informs the jury of the officer's belief that the defendant is guilty of battery. *Heare v. State*, 205 So. 3d 823, 827 (Fla. 2d DCA 2016).

Here, it was error to allow the Gardens officer to express the opinion that the defendant could "still be a principal to murder by what he did." Not only did the officer apply a legal standard to a set of facts, but he also implicitly opined that appellant was guilty of murder under the principal theory. The prosecutor's question did not merely ask the officer whether appellant could be a principal to murder by what he *confessed to*, but rather asked whether appellant could be a principal to murder "by what *he did*." Because the prosecutor's question presupposed that appellant actually committed the acts he confessed to, the officer's affirmative answer essentially told the jury that he believed appellant's actions made him a principal to murder.

Moreover, contrary to the State's argument, the officer's testimony was not a "fair response" to defense counsel bringing out that appellant claimed he was innocent in his letter to police. While defense counsel's cross-examination of the officer opened the door to the officer reiterating the details of appellant's confessions, it did not open the door to the State eliciting improper opinion testimony that appellant could "still be a principal to murder by what he did."

Nonetheless, the witness's impermissible comment on a legal conclusion did not rise to the level of fundamental error.

The doctrine of fundamental error should be applied only in rare cases. *F.B. v. State*, 852 So. 2d 226, 229 (Fla. 2003). To constitute fundamental error, "the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960).

In this case, the officer's improper comment was made in the context of discussing appellant's claim in his letter that he was "not a murderer," even though appellant admitted to facts which, if true, would make him guilty of murder under the principal theory. Notably, at trial, appellant never disputed that the actions to which he confessed would make him a principal to murder. Instead, appellant raised an alibi defense and claimed that he had falsely confessed to the crime. Because the jury rejected the alibi defense, we conclude that the verdict of guilty could have been obtained regardless of the officer's comment concerning the principal theory. The Gardens officer's isolated suggestion concerning the application of a principal theory was insignificant in the face of the trial judge's instruction on the law.

**Having appointed an expert to evaluate appellant's competency to proceed to trial, the trial court erred in failing to hold an adequate hearing on the issue and failing to make an independent determination that appellant was competent to proceed to trial**

*Additional Facts*

On April 1, 2013, the trial court entered an order appointing an expert to evaluate appellant's competency.

On April 16, 2013, the trial court held a short hearing at which it addressed appellant's competency.[2] A defense lawyer standing in for appellant's assigned public defender stated that she was waiving appellant's presence at the hearing. The stand-in lawyer further stated: "The Court ordered an evaluation the last time we were here. We've reviewed that. It says that he is competent and I would be prepared to stipulate." The stand-in lawyer noted, however, that she had not gotten in touch with the assigned lawyer and that the assigned lawyer might want to take a different course of action.

---

[2] The trial judge who presided over the competency hearing was not the same judge who presided over the trial.

The trial court replied: "Well, I will leave it to [the assigned lawyer] if he still wants to contest it." The prosecutor stated that he had "no problem with that." The trial court then ruled: "All right. Based upon the stipulation to the evaluation I do find the defendant to be competent at this time."

The trial court never entered a written order addressing appellant's competency to proceed to trial.

For sentencing, which was about five weeks after the jury returned its verdict, the trial court appointed an expert to evaluate appellant's competency to proceed to the sentencing stage. The expert testified that appellant was competent to proceed to sentencing and that he was malingering. Relying on the expert's testimony, the trial court found that appellant was competent to proceed to sentencing.

*Merits*

"The issue of whether a trial court fundamentally erred in failing to hold an adequate competency hearing is reviewed de novo." *Pittman v. State*, 254 So. 3d 494, 496 (Fla. 4th DCA 2018).

"Once a reason for a competency hearing has arisen, the defendant has a due process right to an independent finding of competency." *Golloman v. State*, 226 So. 3d 332, 335 (Fla. 2d DCA 2017). "This right cannot be waived, and a trial court's failure to make such a finding constitutes fundamental error." *Id.*

A defendant cannot stipulate to the ultimate issue of competency. *Dougherty v. State*, 149 So. 3d 672, 678 (Fla. 2014). "Accepting a stipulation improperly absolves the trial court from making an independent determination regarding a defendant's competency to stand trial." *Id.* However, when the parties agree, the trial court "may decide the issue of competency on the basis of written reports alone." *Id.* at 679.

"A status hearing may constitute a sufficient competency hearing if the court reviews a written competency evaluation at the parties' direction and makes an independent finding that the defendant is competent to proceed." *Presley v. State*, 199 So. 3d 1014, 1018 (Fla. 4th DCA 2016). However, a stipulation to a report's determination of competency, as opposed to an agreement to determine competency based on the report alone, is insufficient to satisfy Florida Rule of Criminal Procedure 3.212. *S.B. v. State*, 134 So. 3d 528, 530 (Fla. 4th DCA 2014).

- 17 -

In other words, a defendant's "stipulation to his own competency [does] not constitute an agreement between the parties to allow the judge to decide the issue of competency on the basis of the written report alone." *Pittman*, 254 So. 3d at 497. Even if it is simply "unclear whether the trial court made an independent determination" of the defendant's competency, the case must be remanded for further proceedings. *Id.*

Here, the record fails to reflect that the trial court made an independent determination of appellant's competency to proceed to trial. There was no agreement between the parties to allow the judge to decide the issue of competency on the basis of the written report alone. It is unclear from the record whether the trial court even reviewed the evaluation. Therefore, because "it is impossible to tell whether the trial court truly made an independent determination of competency," the case must be remanded for further proceedings. *Id.*

On remand, the trial court must make the determination, in the first instance, of whether a nunc pro tunc evaluation of competency is possible. We see two reasons why a retrospective competency evaluation may be possible in this case: (1) the trial judge had the opportunity to observe appellant testify at trial; and (2) a competency evaluation occurred just five weeks after trial to determine appellant's competency for sentencing. *See People v. Pena*, 675 N.Y.S.2d 330, 335 (N.Y. App. Div. 1998) (holding that the defendant's competency to stand trial was capable of retrospective determination where multiple evaluations of the defendant were undertaken in the months between the jury's verdict and sentencing).

For these reasons, we temporarily remand the case to the trial court to follow the procedures outlined in *Machin v. State*, 267 So. 3d 1098 (Fla. 4th DCA 2019) (en banc), including deciding whether a nunc pro tunc competency evaluation is possible.

## No fundamental error occurred when appellant was adjudicated guilty of "armed" kidnapping

*Additional Facts*

Count II of the indictment charged appellant with armed kidnapping, alleging that appellant and "others unknown" kidnapped the victim against his will "and in the course thereof, there was carried a deadly weapon, to-wit: a knife, contrary to Sections 787.01(a) [sic], 787.01(2) and 775.087(1)(a), (L10), of the Florida Statutes." The jury was instructed that one of the elements of armed kidnapping was that "a weapon was carried in the course of committing the kidnapping." The jury found appellant

guilty of armed kidnapping as charged in the indictment. The jury did not make a finding as to whether appellant personally carried a weapon. The judgment of conviction states that appellant was found guilty of armed kidnapping but lists the degree of the offense as a first-degree felony. Appellant did not object below to either the jury instruction on armed kidnapping, the verdict form, or to his conviction for armed kidnapping.

The trial court sentenced appellant to life in prison on both counts, finding in relevant part that the circumstances of appellant's offenses were heinous, that "the evidence clearly show[ed] that the defendant actively and personally participated in the kidnapping and murder of the victim," and that the court had not seen "any evidence that [appellant] could be rehabilitated."

Appellant argues that fundamental error occurred when he was convicted of armed kidnapping based upon another person's possession of a weapon during the commission of the crime. He contends that his conviction must be reduced to kidnapping and the cause remanded for resentencing.

*Discussion*

"Whether an error is fundamental is a de novo determination." *Terrien v. State*, 94 So. 3d 648, 649 (Fla. 4th DCA 2012).

Section 787.01, Florida Statutes, governs the crime of kidnapping, which is a first-degree felony punishable by imprisonment for a term of years not exceeding life. § 787.01(2), Fla. Stat. (2007). Section 787.01 makes no distinction between armed and unarmed kidnapping.

However, section 775.087(1)(a), Florida Statutes (2007), provides that when a person is charged with a first-degree felony in which the use of a weapon or firearm is not an essential element, and during the commission of that felony "carries, displays, uses, threatens to use, or attempts to use any weapon or firearm," the offense shall be reclassified to a life felony.

"[S]ection 775.087(1) does not, by its terms, allow for vicarious enhancement because of the action of a codefendant." *State v. Rodriguez*, 602 So. 2d 1270, 1271 (Fla. 1992). We agree with the Third District that a defendant may properly be convicted as a principal to the crime of armed kidnapping, even if he did not personally possess a weapon during the commission of the crime, so long as the sentence is not enhanced pursuant to section 775.087. *Allen v. State*, 283 So. 3d 372, 373 n.2 (Fla. 3d DCA 2019).

Here, appellant is correct that his conviction on Count II could not be reclassified to a life felony under section 775.087(1)(a) absent a jury finding that he personally carried a weapon during the commission of the crime. However, the record does not show that appellant's conviction was ever reclassified to a life felony. Although the judgment describes appellant's conviction on Count II as "armed kidnapping" and lists section 755.087(1)(a) as one of the statutes for the offense, the judgment also states that the degree of the crime was a first-degree felony. Thus, appellant's kidnapping conviction was not improperly reclassified as a life felony.

Even assuming an improper reclassification, resentencing is not required. "On direct appeal from a sentence, the test for harmless error is whether the same sentence would have been imposed." *Noa v. State*, 199 So. 3d 1004, 1005 (Fla. 4th DCA 2016). Here, based on the trial court's comments at sentencing, it is clear that the same life sentence would have been imposed on Count II irrespective of whether the reclassification applied. The trial court found that the circumstances of appellant's crimes were heinous, that appellant actively participated in the kidnapping and murder of the victim, and that there was no evidence appellant could be rehabilitated. The trial court did not mention anything about a weapon in its discussion of the proper sentence. Thus, any error was harmless. By definition, a harmless error cannot be fundamental error, nor can it be prejudicial for purposes of an ineffective assistance claim.

### The trial court complied with sections 921.1401 and 921.1402, Florida Statutes, in imposing sentence

*Additional Facts*

At the sentencing hearing, the prosecutor noted that appellant was 16 years old when the crimes occurred and that the sentencing would proceed under section 921.1401, Florida Statutes. The prosecutor also incorrectly argued that the court did not have to consider all of the factors in section 921.1401.

Defense counsel contended that the trial court should not sentence appellant to life, as appellant's actual participation in the crimes was minimal. After hearing evidence and argument, the trial court pronounced sentence as follows:

> Okay. In reviewing Florida Statute 921.1401, I do find that the nature and circumstances of the offense committed by Mr.

Dubon were, in fact, heinous. There was a tremendous effect that crime had on the victim's family. I do find that the actions of the defendant evidenced his maturity and intellectual capacity in that he had absolutely no problem leaving Honduras on his own and navigating his way through the countries to get here to the United States without a problem.

There's no evidence of any familial or peer pressure that was placed on the defendant. I find the defendant – the evidence clearly shows that the defendant actively and personally participated in the kidnapping and murder of the victim and I haven't seen any evidence that Mr. Dubon could be rehabilitated. And at this time I'm going to sentence Mr. Dubon on counts one and two to life in prison.

Appellant moved to correct a sentencing error under Florida Rule of Criminal Procedure 3.800(b)(2), arguing that: (1) the record did not make clear that the trial court understood it was required to sentence appellant pursuant to section 775.082(1)(b)2., Florida Statutes, because the jury never made a finding that he actually killed, intended to kill, or attempted to kill the victim; (2) the trial court did not make a specific finding that life in prison was an appropriate sentence; (3) the trial court failed to address all the required factors in section 921.1401(2), Florida Statutes; and (4) he was entitled to resentencing because his sentence lacked a review mechanism.

The trial court granted in part and denied in part appellant's rule 3.800(b)(2) motion.

The trial court incorporated the State's response and stated that the record reflected that the court reviewed section 921.1401, considered all relevant factors, and made the required findings. The trial court further stated that "concurrent terms of life imprisonment for the crimes charged is an appropriate sentence," that the court sentenced appellant "based on the facts of the case," and that "[t]here is nothing in the record to reflect that the Court did not understand that it had the option not to sentence [appellant] to life imprisonment." Finally, the trial court agreed that the sentence lacked a review mechanism and indicated that an order would be entered specifying that appellant was "entitled to judicial review pursuant to section 921.1402, Florida Statutes, after fifteen (15) years in prison for murder in the first degree because there was no factual finding that appellant "actually killed the victim," and that appellant was "entitled to have his sentence for armed kidnapping reviewed after twenty (20) years." The trial court entered a written order reflecting this ruling.

A trial court's order on a rule 3.800(b)(2) motion is reviewed de novo. *Brooks v. State*, 199 So. 3d 974, 976 (Fla. 4th DCA 2016).

*The record does not reflect that the trial court misunderstood its sentencing discretion under Section 775.082(1)(b)*

First, appellant argues that the jury never made a finding that he actually killed, intended to kill, or attempted to kill the victim, and that the record does show that the trial court understood it was required to sentence him pursuant to section 775.082(1)(b)2., Florida Statutes.

The level of discretion a trial court has when sentencing a defendant who committed a capital felony before the age of 18 depends on whether the defendant "actually killed, intended to kill, or attempted to kill the victim":

> 1.  A person *who actually killed, intended to kill, or attempted to kill the victim* and who is convicted under s. 782.04 of a capital felony, or an offense that was reclassified as a capital felony, which was committed before the person attained 18 years of age *shall* be punished by a term of imprisonment for life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence. If the court finds that life imprisonment is not an appropriate sentence, such person shall be punished by a term of imprisonment of at least 40 years. A person sentenced pursuant to this subparagraph is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(a).
>
> 2. A person *who did not actually kill, intend to kill, or attempt to kill the victim* and who is convicted under s. 782.04 of a capital felony, or an offense that was reclassified as a capital felony, which was committed before the person attained 18 years of age *may* be punished by a term of imprisonment for life or by a term of years equal to life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence. A person who is sentenced to a term of imprisonment of more than 15 years is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(c).

§ 775.082(1)(b)1.–2., Fla. Stat. (2018) (emphasis added).

"Thus, a finding that a juvenile offender actually killed, intended to kill, or attempted to kill the victim results in a minimum sentence of forty years' imprisonment under subsection (1)(b)1. Without this finding, the trial court is not required to impose a minimum sentence." *Williams v. State*, 242 So. 3d 280, 288 (Fla. 2018). "Further, under section 921.1402, a finding of actual killing, intent to kill, or attempt to kill entitles a juvenile offender to a sentence review in twenty-five years, whereas without the finding, the juvenile offender is entitled to a sentence review in fifteen years . . . ." *Id.*

Under *Alleyne v. United States*, 570 U.S. 99 (2013), the jury is required "to make the factual finding under section 775.082(1)(b) as to whether a juvenile offender actually killed, intended to kill, or attempted to kill the victim." *Williams*, 242 So. 3d at 294. Where an error in failing to submit the issue to the jury cannot be deemed harmless, the proper remedy is to resentence the juvenile offender pursuant to section 775.082(1)(b)2. *Id.* at 282, 292–93.

Here, because the jury did not make a finding that appellant "actually killed, intended to kill, or attempted to kill the victim" (and the record does not demonstrate beyond a reasonable doubt that a rational jury would have made such a finding), the trial court was required to sentence appellant pursuant to section 775.082(1)(b)2. However, the trial court did not indicate at the sentencing hearing whether it was sentencing appellant pursuant to section 775.082(1)(b)1. or section 775.082(1)(b)2.

Still, nothing in the record suggests that the trial court sentenced appellant under section 775.082(1)(b)1. The trial court never purported to make its own finding that appellant "actually killed, intended to kill, or attempted to kill the victim." And the State never argued at sentencing that appellant was subject to a minimum sentence of 40 years under section 775.082(1)(b)1.

The trial court's orders in response to appellant's rule 3.800(b)(2) motion further support the conclusion that the trial court was never under the misapprehension that it was required to sentence appellant pursuant to section 775.082(1)(b)1. One of the orders indicates that the trial court understood it had the option not to sentence appellant to life, but nonetheless found that, based on the facts of the case, "concurrent terms of life imprisonment for the crimes charged is an appropriate sentence." Moreover, the trial court's other order provides that appellant will receive judicial review of his sentence on Count I after 15 years, which indicates that the sentence was pursuant to section 775.082(1)(b)2.

Even assuming the trial court erred in failing to specify at the sentencing hearing whether it was sentencing appellant pursuant to section 775.082(1)(b)1. or section 775.082(1)(b)2., any error is harmless because the trial court's comment that a life sentence was an appropriate sentence conclusively shows that the trial court would have imposed the same sentence.  *See Puzio v. State*, 278 So. 3d 82, 86 (Fla. 4th DCA 2019) ("The defendant is not entitled to a new sentencing hearing under section 775.082(1)(b) 2., because the trial court already stated that 'it equally finds a sixty-year sentence appropriate under section 775.082(1)(b)(2) in light of the facts of this case.'  We agree with the state that the trial court's comments conclusively show that the court would have imposed the same sentence.").

*The trial court did not fail to make a finding that a life sentence was an appropriate sentence.*

Second, appellant argues that the trial court erred in failing to make the specific finding that life in prison was an appropriate sentence.

Contrary to appellant's argument, the trial court's comments at the sentencing hearing make it clear that the trial court was finding a life sentence to be an appropriate sentence.  Even if the trial court's failure to use the magic words "appropriate sentence" at the sentencing hearing was somehow error, the error was corrected when the trial court made this explicit finding in its order on appellant's rule 3.800(b)(2) motion.

*The record reflects that the trial court reviewed and considered all relevant factors under section 921.1401(2).*

Third, appellant argues that the trial court failed to address all the required factors in section 921.1401(2), Florida Statutes.

Section 941.1401(2) sets forth a nonexclusive list of factors that the trial court shall consider in determining whether life imprisonment is an appropriate sentence for a juvenile offender.

Section 921.1401(2) "states that the trial court shall consider factors (a) through (j) in determining whether a life sentence is appropriate, but it does not require the trial court to make specific findings regarding those factors." *Bailey v. State*, 277 So. 3d 173, 178 (Fla. 2d DCA 2019).  Under the rule implementing this statute, "[t]he court shall make specific findings on the record that all relevant factors have been reviewed and considered by the court prior to imposing a sentence of life imprisonment or a term of

- 24 -

years equal to life imprisonment." Fla. R. Crim. P. 3.781(c)(1). "Specifically, courts must find on the record that they have (1) 'reviewed' and (2) 'considered' all relevant factors prior to imposing a life sentence." *Dortch v. State*, 266 So. 3d 1240, 1243–44 (Fla. 1st DCA 2019).

Here, it is clear from the record that the trial court considered all relevant factors prior to imposing a life sentence. Although the trial court did not use the magic language "all relevant factors have been reviewed and considered by the court," the trial court did specifically state that it had reviewed section 921.1401. The trial court then proceeded to make specific findings as to most, but not all, of section 921.1401(2)'s statutory factors.

Appellant complains that the trial court "failed to address factors (d), (e), (h), and (i)." However, as the State points out, many of the statutory factors are interrelated, and factors (d), (e), and (i) were arguably covered by the trial court's comments about how appellant's journey to the United States demonstrated his maturity and intellectual capacity. Furthermore, because there was no evidence that appellant had a prior criminal history, the trial court may have found it unnecessary to specifically discuss factor (h). Finally, the trial court stated in its order on appellant's rule 3.800(b)(2) motion that it had reviewed section 921.1401 and considered all relevant factors.

*The trial court was not required to hold a full resentencing hearing*

Finally, appellant argues that that because the original sentence lacked a review mechanism, the proper remedy was resentencing—not amending the sentencing documents to provide for a review mechanism.

Where the sentencing court fails to "make the required findings at [the juvenile defendant's] sentencing hearing to comport with chapter 2014–220, Laws of Florida," and where the sentence lacks any review mechanism, the defendant is entitled to resentencing. *Morris v. State*, 246 So. 3d 244, 245 (Fla. 2018). For example, in a case where the defendant's sentence for second-degree murder was imposed before the enactment of section 921.1401, the Fifth District held that "it was error for the trial court to amend the sentence to provide for a review hearing without first conducting a resentencing hearing." *Katwaroo v. State*, 237 So. 3d 446, 447 (Fla. 5th DCA 2018), *disapproved on other grounds by Pedroza v. State*, SC18-964, 2020 WL 1173747 (Fla. Mar. 12, 2020).

By contrast, in *Puzio*, this court held that a correction to a sentencing order to provide for judicial review after 15 years, instead of after 25 years,

was a ministerial correction for which the defendant did not need to be present.  278 So. 3d at 86.

The present case is distinguishable from *Morris* and *Katwaroo*.  Unlike *Morris* and *Katwaroo,* appellant's sentencing hearing was conducted pursuant to section 921.1401.  This case is akin to *Puzio,* which was a case where the defendant received a resentencing hearing conducted in accordance with section 921.1401; we held that a change to the waiting period for judicial review was a ministerial correction to the sentencing order.  Similar reasoning applies to the facts of this case.  Because appellant has already received a sentencing hearing that comported with section 941.1401, the correction of the sentencing order to provide for a review mechanism was a ministerial correction.

For these reasons, we affirm the convictions and sentences in all respects and remand to the circuit court to conduct further proceedings on the issue of appellant's competency consistent with this opinion and *Machin v. State.*

CONNER and FORST, JJ., concur.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***