# Supreme Court of Florida

_____

No. SC2021-1047
_____

**STATE OF FLORIDA,**
Petitioner,

vs.

**HERBERT LEON MANAGO, JR.,**
Respondent.

November 30, 2023

COURIEL, J.

It is "the historic role of the jury" to stand as "an intermediary between the State and criminal defendants." *Alleyne v. United States*, 570 U.S. 99, 114 (2013). For this reason, while a trial court has broad discretion to sentence a person convicted of a crime to a term of incarceration within the range authorized by law, the Sixth Amendment requires that, when a fact other than the existence of a prior conviction "aggravates the legally prescribed range of allowable sentences, it constitutes an element of a separate, aggravated offense that must be found by the jury," if not admitted by the

defendant, "regardless of what sentence the defendant *might* have received if a different range had been applicable." *Id.* at 115.

We have said that when a trial court breaks this rule by making a decision constitutionally reserved to a jury (and commits *Alleyne* error), it is the job of a reviewing court to decide whether the resulting violation of the defendant's right to a fair trial was harmful. *Williams v. State*, 242 So. 3d 280, 290 (Fla. 2018).

In this case, the trial court made an *Alleyne* error, then compounded its mistake by purporting to review its own decision to determine whether the *Alleyne* error was harmful—a task that resides with a reviewing court. On appeal, the Fifth District Court of Appeal found harmful error and, citing our decision in *Williams*, held that the only available remedy under the circumstances was to remand the case with instructions to resentence the defendant under a different statutory provision: one that carried a lesser penalty. *Manago v. State*, 317 So. 3d 1192 (Fla. 5th DCA 2021). In doing so, it certified conflict with *Green v. State*, 314 So. 3d 611 (Fla. 3d DCA 2020),[1] on a narrow question: whether on remand, as

---

1. We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const.

- 2 -

an alternative to resentencing under the statute with the lesser penalty, the trial court could instead empanel a jury to make the factual determination that would have permitted the court to sentence the defendant under the statutory provision with a harsher penalty.

On that narrow question, we find that the Third District Court of Appeal's decision in *Green* more faithfully applies *Alleyne*'s command than the Fifth District's decision in this case. Thus, while we agree with the Fifth District that the trial court committed harmful *Alleyne* error, we quash its decision to the extent it directed that only resentencing would be an appropriate remedy. In doing so, we recede from *Williams*'s rejection of the most natural remedy for a trial court's having erroneously taken from a jury a decision that a jury alone should make: giving it back.

**I**

Herbert Leon Manago, Jr., was seventeen when he and three others—Adrian Nelson, Tamonta Sampson, and Ronald Brown—carjacked a vehicle and shot its driver.

On the night of the incident, the group had pulled into a Burger King parking lot in Nelson's car. In an adjacent vehicle, a

Ford Crown Victoria, sat Donell King, Ronald King, Mandy Gaddis, and Amanda Johnson. Manago and the others in Nelson's car decided to steal the Ford.

Nelson and Sampson testified at Manago's trial that Sampson was in the driver's seat of Nelson's car while Nelson, Manago, and Brown stood behind the car, planning their next move. At this point, Nelson testified, Manago "indicated" to the group that he had a gun in his waistband by patting his hip; Nelson did not actually see a weapon.[2]

When Ronald King exited the Ford and went into the Burger King, an individual from Manago's group waited for him to return. Once he did, that individual approached Ronald King with a gun and forced him inside Nelson's car. Nelson testified that he saw Manago hold Ronald King at gunpoint. And Sampson testified that he saw Manago force Ronald King into Nelson's car. Ronald King, however, initially described whoever approached him at gunpoint as "a short guy," no taller than 5'7"—a description that

---

2. Ronald King initially told police that he remembered seeing a second gun in the lap of the person sitting in the driver seat of Nelson's car, but he later recanted, telling police that he was mistaken.

does not match Manago, who stood around 6'2" at the time of the shooting. Otherwise, Ronald King could not provide a positive identification.

Meanwhile, Nelson walked over to the Ford and sat in the driver's seat. Gaddis bolted from the car as another individual removed Johnson from the front passenger's seat. Johnson first identified Sampson as the person who pulled her from the car, then later insisted that it was Brown. Sampson, however, testified that Brown stood behind Nelson's car while he remained in the driver's seat of Nelson's car throughout the incident.

Nelson then tried to drive off in the Ford. But Donell King, still sitting in the back seat, grabbed Nelson from behind. Another individual joined the struggle. Sampson testified that he saw Manago get into the back seat of the Ford. Nelson testified that he "saw a glimpse" of Brown in the back seat of the Ford during the struggle. And Ronald King testified that, although he saw whoever had approached him at gunpoint "approach[] the back seat" of the Ford, he never saw that individual get into the back seat.

The struggle between the three ended with a gunshot to Donell King's neck, killing him. Just after the gun fired, Nelson took off in

- 5 -

the Ford as Donell King lay on the parking lot pavement. But Nelson's getaway was brief; police apprehended him later that night. A test for gun residue on Nelson's hands came back negative. He cooperated with law enforcement. Subsequently, in exchange for his testimony against Manago, Nelson's charge was reduced to second-degree murder.

Sampson, Brown, and Manago fled the crime scene on foot. Ronald King raced after whoever had approached him at gunpoint through an alleyway behind Burger King until the individual escaped, jumping over the wall. A nearby law enforcement officer, Deputy Zufelt, testified that he spotted "two to three" people run into that same alleyway. Once Ronald King returned to the crime scene, he and Gaddis informed another law enforcement officer that Nelson was the shooter.

Sampson, Brown, and Manago regrouped at a hotel nearby. During their meeting, Sampson later testified, Manago admitted that he pulled the trigger and hid the murder weapon in the alleyway behind the Burger King. Sally Sampson—Sampson's mother and Nelson's aunt—similarly testified that she heard Manago talking about hiding the gun after the shooting, which

motivated her to call the police and tell them where to find the weapon. Tamonta Sampson also testified that he overheard Manago's phone call with his mother, Latasha Mitchell, in which he said he had shot someone and needed her to come pick him up. Mitchell, however, disputed that account.

The State charged Manago, Brown, and Sampson with first-degree felony murder and carjacking with a firearm. Though the State presented evidence at trial that Manago was the shooter, it explained to the jury that Manago could be found guilty either as the shooter who killed the victim or as a principal to the crime.[3] At the State's request, the jury was instructed that Manago could be found guilty of first-degree felony murder under either theory:

> To prove the crime of First Degree Felony Murder against Herbert Manago, the State must prove the following three elements beyond a reasonable doubt:

---

3. At the time of the trial, the jury did not need to determine whether Manago was the shooter to convict him as charged, so long as it found that the victim was shot and killed during the carjacking. Under the statute at issue here, a life sentence without parole always followed a first-degree murder conviction. Whether Manago "actually killed" the victim became significant for sentencing purposes only with the retroactive application of section 775.082(1)(b), Florida Statutes (2014), as part of the State's revised juvenile sentencing scheme. *See Horsley v. State*, 160 So. 3d 393 (Fla. 2015).

. . .

3. Herbert Manago was the person who actually killed Donnell King;

or

Donnell King was killed by a person other than Herbert Manago; but both Herbert Manago and the person who killed Donnell King were principals in the commission of Carjacking.

In order to convict of First Degree Felony Murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill.

The jury convicted Manago of carjacking with a firearm and first-degree felony murder. The verdict form did not specify whether Manago was the shooter, nor under which theory the jury convicted him for first-degree felony murder; it stated only that the jury found Manago guilty of first-degree felony murder and carjacking "as charged in the Indictment." The trial court sentenced Manago to mandatory life in prison without the possibility of parole and a concurrent thirty-year prison sentence for carjacking with a firearm.

While Manago was serving his sentence, the United States Supreme Court decided in *Graham v. Florida* that it is a violation of

- 8 -

the Eighth Amendment's prohibition on cruel and unusual punishment for a juvenile offender convicted of a non-homicide crime to receive a life sentence without the possibility of parole. 560 U.S. 48, 82 (2010). It explained that states are "not required to guarantee eventual freedom" to juvenile non-homicide offenders but must, at the least, impose a sentence that provides "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. Soon after, the U.S. Supreme Court extended its *Graham* holding in *Miller v. Alabama* to bar sentencing schemes that mandated life without the possibility of parole for juveniles convicted of homicide offenses. 567 U.S. 460, 479 (2012).

The Florida Legislature then revised its juvenile sentencing scheme to bring it "into compliance with the [U.S.] Supreme Court's recent Eighth Amendment juvenile sentencing jurisprudence." *Horsley v. State*, 160 So. 3d 393, 394 (Fla. 2015). As part of this update, the Legislature amended section 775.082(1), Florida Statutes, to provide, in pertinent part:

> (b)1. A person who actually killed, intended to kill, or attempted to kill the victim and who is convicted under s. 782.04 of a capital felony, or an offense that was

reclassified as a capital felony, which was committed before the person attained 18 years of age shall be punished by a term of imprisonment for life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence. If the court finds that life imprisonment is not an appropriate sentence, such person shall be punished by a term of imprisonment of at least 40 years. A person sentenced pursuant to this subparagraph is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(a).

2. A person who did not actually kill, intend to kill, or attempt to kill the victim and who is convicted under s. 782.04 of a capital felony, or an offense that was reclassified as a capital felony, which was committed before the person attained 18 years of age may be punished by a term of imprisonment for life or by a term of years equal to life if, after a sentencing hearing conducted by the court in accordance with s. 921.1401, the court finds that life imprisonment is an appropriate sentence. A person who is sentenced to a term of imprisonment of more than 15 years is entitled to a review of his or her sentence in accordance with s. 921.1402(2)(c).

Ch. 2014–220, § 1, Laws of Fla. Alongside these changes, the

Legislature also created section 921.1402, Florida Statutes, which

provides, in pertinent part:

(2)(a) A juvenile offender sentenced under s. 775.082(1)(b)1. is entitled to a review of his or her sentence after 25 years [unless the juvenile offender has previously been convicted of certain enumerated offenses that were part of a separate criminal transaction or episode].

. . .

   (c) A juvenile offender sentenced to a term of more than
   15 years under s. 775.082(1)(b)2., s. 775.082(3)(a)5.b., or
   s. 775.082(3)(b)2.b. is entitled to a review of his or her
   sentence after 15 years.

Ch. 2014–220, § 3, Laws of Fla.

Together, these statutes set new sentencing parameters for juvenile capital felony offenders while eliminating mandatory life sentences without the possibility of parole. Under the new sentencing scheme, juvenile capital felony offenders may still receive a term of life imprisonment. But if a defendant "actually kill[s]" a victim and is sentenced under section 775.082(1)(b)1., the mandatory minimum sentence is forty years, with review required after twenty-five years. And if the defendant did not "actually kill" the victim and is sentenced instead under section 775.082(1)(b)2., there is no mandatory minimum sentence, with review required after fifteen years.

Manago sought resentencing under the new sentencing scheme, arguing that his original juvenile sentence of life without the possibility of parole was unlawful following *Miller*. The State

agreed, and the trial court granted Manago's request. The parties disagreed, however, about which sentencing provision applied.

Manago argued he should be resentenced under section 775.082(1)(b)2., Florida Statutes (2016), because the jury never found beyond a reasonable doubt that he "actually kill[ed] . . . the victim." The trial court had used a verdict form asking only whether Manago was guilty "as charged in the Indictment." At the time, Manago's first-degree felony murder conviction and sentence did not turn on whether he was actually the shooter—the jury only had to determine that the victim was shot and killed during the carjacking. Thus, absent a jury finding that he was the shooter, Manago argued, he should be resentenced under section 775.082(1)(b)2., which applied to juvenile capital felony offenders "who did not actually kill . . . the victim."

For support, Manago cited our decision in *Williams*, where we held—following *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), and its progeny[4]—that a defendant sentenced under section

---

4. In *Apprendi*, the U.S. Supreme Court held that the Sixth Amendment requires, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and

775.082(1)(b) has a right to have a jury determine whether the defendant "actually killed, intended to kill, or attempted to kill the victim." 242 So. 3d at 294. So Manago requested that the trial court resentence him under 775.082(1)(b)2., which carries a lesser penalty.

The State, on the other hand, urged the trial court to determine that "the jury would have found [Manago] to be the actual killer" and sentence him instead under section 775.082(1)(b)1. It argued that when there is no jury finding that the defendant "actually killed" the victim, *Williams* tasks the trial court with determining "whether the absence of such a finding was harmless." And on the record before the trial court, the State asserted, the *Alleyne* violation was indeed harmless because "a rational jury would have found that [Manago] actually killed the victim."

---

proved beyond a reasonable doubt." 530 U.S. at 490. The Court later extended this Sixth Amendment principle to include mandatory minimum sentences in *Alleyne,* explaining that "[f]acts that increase the mandatory minimum sentence are . . . elements and must be submitted to the jury and found beyond a reasonable doubt." 570 U.S. at 108.

The trial court agreed with the State and sentenced Manago under section 775.082(1)(b)1. Recognizing that section 775.082(1)(b)1. requires a jury to find beyond a reasonable doubt that the juvenile "actually killed, intended to kill, or attempted to kill the victim," the court concluded that the case "lack[ed] an adequate jury finding." Even so, it decided that a sentence under section 775.082(1)(b)1. was proper because "the record demonstrates beyond a reasonable doubt that a rational jury would have found [Manago] actually killed the victim." In other words, the trial court determined that Manago was eligible for resentencing under section 775.082(1)(b)1. because it reviewed its own *Alleyne* violation and found it harmless. After considering "all of [the section 921.1401] factors," the court imposed a life sentence for Manago's first-degree murder conviction and a concurrent thirty years for his carjacking conviction.

Manago appealed, and the Fifth District vacated his sentence. The court held that the "resentencing court erred in conducting a harmless error analysis to excuse its own concurrent *Alleyne* violation." *Manago*, 317 So. 3d at 1194. It explained that "even if the error could be considered harmless . . . it is not appropriate for

- 14 -

a [trial] court to commit error simply because it might be found to be harmless." *Id.* (alteration in original) (quoting *United States v. Salery*, 119 F. Supp. 2d 1268, 1272 n.3 (M.D. Ala. 2000)).

Having found reversible error, the Fifth District turned to the proper remedy. Under similar circumstances in *Green*, the Third District had remanded for resentencing under section 775.082(1)(b)2. while also providing the State with the option to empanel a jury on remand to find the missing facts. *See* 314 So. 3d at 616. But, said the Fifth District, this Court in *Williams*, 242 So. 3d at 292-93, "specifically considered and rejected the option of empaneling a new jury to make the requisite findings, and clearly chose resentencing [under] section 775.082(1)(b)2. as the sole remedy on remand." *Manago*, 317 So. 3d at 1195. So the Fifth District remanded with instructions to resentence Manago under section 775.082(1)(b)2. and certified direct conflict with the Third District's decision in *Green*. *Id.*

The State moved for rehearing, arguing that the Fifth District failed to conduct a harmless error review of the trial court's *Alleyne* violation. According to the State, the Fifth District wrongly concluded that, once the trial court had determined that it lacked

- 15 -

the requisite factual findings to resentence Manago under section 775.082(1)(b)1., the only action the trial court could take was to resentence Manago under section 775.082(1)(b)2. But the district court disagreed:

> [W]e already conducted a harmless error review, as required by section 924.33, Florida Statutes (2020), but we decline to use the analysis from *Green* because our case does not involve traditional *Alleyne* error. . . . The issue, and thus the error, presented to us in this case was whether the resentencing court erred in conducting a harmless error analysis to excuse its own concurrent *Alleyne* violation.

*Manago*, 317 So. 3d at 1195. And because the district court could not conclude the error was harmless beyond a reasonable doubt, it denied rehearing.

The State then sought review in this Court, challenging the Fifth District's alleged failure to (1) consider whether the trial court's *Alleyne* error was harmless and (2) provide the State with the option on remand to empanel a jury to make the required factual finding to support a sentence under section 775.082(1)(b)1.

## II

The trial court committed harmful *Alleyne* error.

- 16 -

## A

Any "element of a separate, aggravated offense" that may increase a defendant's sentence "must be found by the jury, regardless of what sentence the defendant *might* have received if a different range had been applicable." *Alleyne*, 570 U.S. at 115. "[T]he essential Sixth Amendment inquiry is whether a fact is an element of the crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." *Id.* at 114-15; *see also Blakely v. Washington*, 542 U.S. 296, 304 (2004) ("When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority." (citation omitted) (quoting 1 J. Bishop, *Criminal Procedure* § 87, at 55 (2d ed. 1872))); *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

An error is subject to harmless error review unless it "always vitiate[s] the right to a fair trial and therefore [is] always harmful." *Davis v. State*, 347 So. 3d 315, 323 (Fla. 2022) (quoting *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995)).  We reasoned in *Williams* that *Alleyne* errors could be harmless because the U.S. Supreme Court held, in *Washington v. Recuenco*, 548 U.S. 212, 221-22 (2006), that errors of a similar kind were harmless.  242 So. 3d at 290; *see also Galindez v. State*, 955 So. 2d 517, 522-23 (Fla. 2007) ("[T]o the extent some of our pre-*Apprendi* decisions may suggest that the failure to submit factual issues to the jury is not subject to harmless error analysis, *Recuenco* has superseded them.").  The trial court in *Recuenco* had committed *Apprendi*/*Blakely* error[5] by imposing a mandatory statutory sentencing enhancement without a jury finding on the necessary aggravating element; the U.S. Supreme Court said that the failure to instruct on an element of the offense was generally subject to

---

5. An *Apprendi*/*Blakely* error occurs when a judge, rather than a jury, finds a fact that increases the statutory maximum sentence; an *Alleyne* error occurs if that fact instead increases the mandatory minimum sentence.  *See United States v. Haymond*, 139 S. Ct. 2369, 2378-79 (2019).

harmless error review. *Recuenco*, 548 U.S. at 221-22. Even though *Recuenco* did not directly address the standard of review for *Alleyne* errors (the Court considered only the *Apprendi/Blakely* error then before it), we noted in *Williams*, 242 So. 3d at 290, that the two errors stem from the same constitutional principle: "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, 570 U.S. at 103 (citing *Apprendi*, 530 U.S. at 483 n.10). Accordingly, we concluded that *Alleyne* violations, like *Apprendi/Blakely* errors, "can be harmless as well" and are therefore subject to harmless error review. *Williams*, 242 So. 3d at 290, 294.

Our harmless error rule is codified in section 924.33, Florida Statutes (2020):

> No judgment shall be reversed unless the appellate court is of the opinion, after an examination of all the appeal papers, that error was committed that injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant.[6]

---

6. In *State v. DiGuilio*, this Court, considering the harmless error standard, explained:

We recently said the test for harmless error focuses on the effect of the error on the trier of fact and "places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *Davis*, 347 So. 3d at 323 (quoting *DiGuilio*, 491 So. 2d at 1135). That is, unless the reviewing court can say that there is "no reasonable possibility" that the error affected the verdict, the error is harmful. *Id.* (quoting *DiGuilio*, 491 So. 2d at 1135).

In *Williams*, this Court considered whether a trial court's *Alleyne* error concerning section 775.082(1)(b), the same provision

---

Section 924.33 respects the constitutional right to a fair trial free of harmful error but directs appellate courts *not* to apply a standard of review which requires that trials be free of harmless errors. . . . Contraposed to this legislative authority, the courts may establish the rule that certain errors *always* violate the right to a fair trial and are, thus, per se reversible. To do so, however, we are obligated to perform a reasoned analysis which shows that this is true, and that, *for constitutional reasons*, we must override the legislative decision.

491 So. 2d 1129, 1134 (Fla. 1986) (footnote omitted).

at issue here, was harmless. We explained that "the applicable question in evaluating whether an *Alleyne* violation is harmful with respect to section 775.082(1)(b) is whether the failure to have the jury make the finding as to whether a juvenile offender actually killed, intended to kill, or attempted to kill the victim contributed to his sentence." *Williams*, 242 So. 3d at 290. In other words, a court must assess "whether the record demonstrates beyond a reasonable doubt that a rational jury would have found the juvenile offender actually killed, intended to kill, or attempted to kill the victim." *Id.*

**B**

We cannot say beyond a reasonable doubt that a rational jury would have found that Manago "actually killed, intended to kill, or attempted to kill" the victim in this case.

Courts have looked to the weight of the evidence in the record, including credibility concerns, and any conflicting evidence when reviewing *Alleyne* violations for harmless error in cases involving section 775.082(1)(b).[7] And here, the record includes several

---

7. *Compare Williams*, 242 So. 3d at 291-92 (error not harmless beyond a reasonable doubt where (1) the defendant disputed both that he killed victim and that he willingly participated in the murder; (2) the record contained "sharply conflicting

- 21 -

evidence"; and (3) an important state witness, whose testimony implicated the defendant as both an active participant in planning the felonious conduct and the actual killer, was a jailhouse informant who had impeachable motives, receiving a reduced sentence in exchange for his testimony), *Green*, 314 So. 3d at 615 (error not harmless beyond a reasonable doubt where (1) "[t]he evidence presented at trial involved two competing narratives, the resolution of which required a credibility determination"; (2) the State's main witness, who testified that the defendant "on several occasions" admitted to killing the victim, had impeachable motives, receiving a reward for his testimony; and (3) the defendant never admitted to actually killing or intending to kill the victim to law enforcement, though he admitted to other elements of the crimes with which he was charged), *Romero v. State*, 315 So. 3d 1245, 1251-52 (Fla. 1st DCA 2021) (error not harmless beyond a reasonable doubt where (1) much of the evidence of the defendant's wrongdoing and statements came from codefendants that had impeachable motives—including familial bias and incentive to testify in exchange for a lesser charge while awaiting sentencing; (2) evidence placed both the defendant and other codefendants close to the victim at the time of the attack; and (3) there was no evidence that the defendant admitted he planned to kill the victim), *and O'Neal v. State*, 298 So. 3d 77, 83 (Fla. 4th DCA 2020) (error not harmless beyond a reasonable doubt where a key witness provided contradictory identifications, first identifying a codefendant as the shooter but later identifying the defendant instead), *with Brown v. State*, 277 So. 3d 616, 621 (Fla. 3d DCA 2018) (harmless error where (1) the defendant told detectives he was the only one armed with a .38 caliber handgun and that he fired the handgun and (2) "undisputed physical evidence" provided that at least one of the four shots fired from Brown's gun struck the victim's chest), *and Colon v. State*, 291 So. 3d 643, 647-48 (Fla. 5th DCA 2020) (harmless error where (1) the defendant confessed to several witnesses and law enforcement that he shot the victim; (2) the defendant was in possession of the murder weapon when arrested; and (3) the record lacked competent evidence that anyone else was present at the time of the murder).

instances of conflicting evidence and contradictory identifications from key witnesses, some with substantial credibility concerns. On those facts, given the lack of direct evidence that Manago was the shooter, we cannot say beyond a reasonable doubt that any rational jury would find that he actually killed, intended to kill, or attempted to kill the victim.

Other than the statements by Manago to which Sally and Tamonta Sampson testified, the State presented no direct evidence that placed Manago inside the Ford around the time of the shooting. Police found none of his fingerprints or hair follicles in the car. When police presented Manago in a photo lineup to the carjacking victims, none identified Manago as even having been at the crime scene.

Witnesses Johnson, Gaddis, and Ronald King had conflicting testimony about the exact whereabouts of codefendants Sampson, Brown, and Manago around the time of the shooting. Johnson first identified Sampson as the person who removed her from the front passenger seat of the Ford. Later, however, Johnson retracted that statement and claimed that it was Brown who had taken her from the car. Gaddis, after first telling law enforcement that Nelson was

the shooter, changed her mind and identified Sampson. Sampson testified that Brown stood behind Nelson's car throughout the incident. But Johnson testified that Brown had removed her from the Ford—though she first identified Sampson as the person who had done so. And Nelson testified that while he was in the driver's seat of the Ford, he "saw a glimpse" of Brown on the back passenger side of the car. Sampson, for his part, testified that he saw Manago get into the back seat of the Ford. And Ronald King testified that, while he saw whoever had approached him at gunpoint "approach[] the back seat" of the Ford, he did not see that individual get into the back seat.

Additionally, the State's evidence linking Manago to the murder weapon implicates his codefendants. Deputy Zufelt testified that "two to three" people—at least including Manago and Brown—ran from the crime scene into the alleyway behind Burger King, where police found the murder weapon. Brown was out of Deputy Zufelt's sight for about five seconds before being apprehended—enough time, a rational jury might conclude, for him, and not Manago, to have hidden the gun.

The record is also inconclusive as to whether Manago admitted to shooting the victim. We know Manago never admitted it to law enforcement. Tamonta Sampson testified that Manago admitted it to him. But on this and other matters, the jury could have rejected, or accepted only in part, the testimony of Manago's codefendants Sampson and Nelson, who had an incentive to downplay their culpability. There was, for example, conflicting testimony about what Manago told his mother when he called her for a ride home. A rational jury could credit Latasha Mitchell's testimony—that her son never said anything about a shooting that night—over the testimony of codefendant Tamonta Sampson.[8]

It is true that the jury found Manago guilty of carjacking with a firearm. But Manago could have been convicted of carjacking with a deadly weapon as a principal even if the jury did not believe he personally possessed a gun. *See Lopez v. State*, 833 So. 2d 283, 284 (Fla. 5th DCA 2002) ("The law of principals allows Lopez to be convicted of [carjacking with a firearm and robbery with a firearm]

---

8. Tamonta's mother, Sally Sampson, is the only witness who corroborated her son's account, testifying that she overheard Manago talking about where he hid the gun.

regardless of whether he personally possessed a firearm . . . .").  In fact, the State, in its closing argument, emphasized that "intent that a carjacking occur[s]" was sufficient under the principal theory for the jury to convict Manago of first-degree felony murder.  *See Williams*, 242 So. 3d at 292 (holding that intent to commit the underlying felony for felony murder does not "equal intent to kill").  And the jury was instructed that "to convict of First Degree Felony Murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill."

If the jury determined Manago had carried a gun that night, that finding might still fall short of proving beyond a reasonable doubt that Manago was the shooter for a few reasons.  First, there is evidence of another gun at the crime scene: Ronald King first told police that he remembered seeing it in the lap of the person sitting in the driver's seat of Nelson's car, and police in fact recovered another gun near the hotel where Manago, Sampson, and Brown regrouped following the shooting.  Second, Ronald King, when shown the murder weapon, could not identify it with certainty as the same gun used to force him inside Nelson's car.  And third, if Manago was indeed the individual who forced Ronald King into

- 26 -

Nelson's car at gunpoint, it is unclear whether he still would have possessed the gun at the time of the shooting.

Based on the record before us, we cannot conclude beyond a reasonable doubt that a rational jury would have found that Manago actually killed, intended to kill, or attempted to kill the victim. *See Green*, 314 So. at 615 ("The evidence presented at trial involved two competing narratives, the resolution of which required a credibility determination best suited for the jury and not judicial factfinding.").

## III

We come to the remedy. Manago insists the Fifth District got it right, remanding the case with instructions to conduct a de novo resentencing for his conviction of first-degree felony murder under section 775.082(1)(b)2. After all, that is precisely what *Williams* prescribes: "Where the error cannot be deemed harmless, the proper remedy is to resentence the juvenile offender pursuant to section 775.082(1)(b)2. . . . ." 242 So. 3d at 282.

That pronouncement, however, is an odd fit with our central holding in *Williams*: that *Alleyne* requires a jury to make the necessary factual finding under section 775.082(1)(b). As the Third

District correctly decided in *Green*, our answer to the certified question in *Williams*[9] does not foreclose the conclusion that where "[t]he evidence presented at trial involved two competing narratives," its resolution on remand may "require[] a credibility determination best suited for the jury and not judicial factfinding." 314 So. 3d at 615.

To deny the trial court recourse to a jury on remand would in fact deviate from the core teaching of *Alleyne*, which is that a factual finding like the one at issue here "must be submitted to the jury and found beyond a reasonable doubt." 570 U.S. at 108; *see Apprendi*, 530 U.S. at 477 ("[T]rial by jury has been understood to require that 'the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be

---

9. That question was:

> DOES *ALLEYNE V. UNITED STATES*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), REQUIRE THE JURY AND NOT THE TRIAL COURT TO MAKE THE FACTUAL FINDING UNDER SECTION 775.082(1)(b), FLORIDA STATUTES (2016), AS TO WHETHER A JUVENILE OFFENDER ACTUALLY KILLED, INTENDED TO KILL, OR ATTEMPTED TO KILL THE VICTIM?

242 So. 3d at 282.

confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . .'" (alteration in original) (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 343 (1769))). Precluding jury consideration of this question at resentencing has the effect of making a judicial finding about the facts, regardless of the evidence. It trespasses on a "fundamental reservation of power in our constitutional structure": the role of the jury as factfinder. *Blakely*, 542 U.S. at 306 ("Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." (citing Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), *reprinted in* 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958) ("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"))).

Adherence in all cases to the remedy we prescribed in *Williams* would also transgress "the general rule 'that a resentencing must proceed "as an entirely new proceeding."'" *Williams*, 242 So. 3d at 294 (Canady, J., concurring in part and dissenting in part) (quoting *State v. Collins*, 985 So. 2d 985, 989 (Fla. 2008)). We have

otherwise consistently maintained that "resentencing should proceed de novo on all issues bearing on the proper sentence," *Morton v. State*, 789 So. 2d 324, 334 (Fla. 2001) (quoting *Teffeteller v. State*, 495 So. 2d 744, 745 (Fla. 1986)), and remanded accordingly, *see Hurst v. State*, 202 So. 3d 40, 45 (Fla. 2016) (remanding for a new penalty phase proceeding after concluding that sentencing error was not harmless beyond a reasonable doubt), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020); *Gaymon v. State*, 288 So. 3d 1087, 1093 (Fla. 2020) (remanding with instruction for a jury to make the required determination "complies with the de novo nature of sentencing proceedings, and fulfills the Legislature's clear purpose").

Our conclusion comports with the text of section 775.082(1)(b). Under both relevant subsections, a jury finding is presupposed: sentencing according to subsection (b)1. requires a finding[10] that the defendant "actually killed, intended to kill, or

---

10. We presume that the Legislature is aware of the law, including relevant judicial precedent, when it enacts a new statute. *Seagrave v. State*, 802 So. 2d 281, 290 (Fla. 2001); *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979) (Stevens, J.) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law . . . ."). The Legislature added section

- 30 -

attempted to kill the victim"; sentencing according to subsection (b)2. requires a finding that the defendant "did *not* actually kill, intend to kill, or attempt to kill the victim." § 775.082(1)(b) (emphasis added). What the statute never contemplates is the remedy we compelled in *Williams*: one where no finding is made by the jury, and where the trial court simply elects the more lenient penalty.

Nor does our decision pose the double jeopardy concern we articulated in *Williams*, for it has long been the law that "a sentence does not have the qualities of constitutional finality that attend an acquittal." *United States v. DiFrancesco*, 449 U.S. 117, 134 (1980); *see, e.g.*, *Hurst v. State*, No. SC2017-0302, 2017 WL 1023762, at *1 (Fla. Mar. 16, 2017) (unpublished) (summarily rejecting "without

---

775.082(1)(b) more than a year after the U.S. Supreme Court announced its decision in *Alleyne*. Ch. 2014–220, § 1, Laws of Fla. And under *Alleyne*, a finding of actual killing, intent to kill, or attempt to kill under subsection (b)1. "aggravates the legally prescribed range of allowable sentences," and is therefore an "element" of the offense, which must be submitted to a jury and found beyond a reasonable doubt. *Alleyne*, 570 U.S. at 115; *see supra* Section II-A. We thus assume that the Legislature, aware of this precedent, drafted subsection (b)1. to require a finding by a jury beyond a reasonable doubt on whether the defendant "actually killed, intended to kill, or attempted to kill the victim."

- 31 -

merit" claims that the State "is precluded from seeking the death penalty" in *Hurst* resentencing proceedings based on "double jeopardy and due process grounds"); *State v. Collins*, 985 So. 2d 985, 993 (Fla. 2008) ("A second attempt to prove the criteria for an enhanced sentence does not equate to 'a second prosecution for the same offense after acquittal.' " (quoting *Lippman v. State*, 633 So. 2d 1061, 1064 (Fla. 1994))); *Trotter v. State*, 825 So. 2d 362, 365 (Fla. 2002) ("[D]ouble jeopardy is not implicated in the context of a resentencing following an appeal of a sentencing issue." (citing *Harris v. State*, 645 So. 2d 386, 388 (Fla. 1994))).

"It is no small matter for one Court to conclude that a predecessor Court has clearly erred." *Poole*, 297 So. 3d at 506. Indeed, having carefully evaluated *Williams* with the presumption that this Court faithfully and competently carried out its duty in deciding that case, *see id.*, we reaffirm that decision's bottom line: a reviewing court must decide, in cases like this one, whether the resulting violation of the defendant's right to a fair trial was harmful. *See Williams*, 242 So. 3d at 290. It is in light of that conclusion that we find our holding as to the appropriate remedy in *Williams* to have been clearly erroneous. *See supra* pp. 29-32. No

reliance interest compels our adhering to it, for no one, including Manago, "altered his behavior in expectation of the" remedy holding from which we recede. *Poole*, 297 So. 3d at 507; *see also Alleyne*, 570 U.S. at 119 (Sotomayor, J., concurring) ("[W]hen procedural rules are at issue that do not govern primary conduct and do not implicate the reliance interests of private parties, the force of *stare decisis* is reduced.").

We recede from *Williams* to the extent it is inconsistent with our conclusion that a trial court, on remand after making an *Alleyne* error, is not foreclosed from empaneling a jury to make a factual determination that affects the legally prescribed range of allowable sentences.

## IV

We quash in part the decision of the Fifth District and remand for resentencing proceedings consistent with our decision.

It is so ordered.

MUÑIZ, C.J., and CANADY, GROSSHANS, and FRANCIS, JJ., concur.
LABARGA, J., dissents with an opinion.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

I disagree with the majority's conclusion that a trial court may remedy a harmful *Alleyne*[11] error by "empaneling a jury to make a factual determination that affects the legally prescribed range of allowable sentences." Majority op. at 33. As such, I respectfully dissent to the majority opinion and the decision therein to recede in part from *Williams*.[12]

I fundamentally disagree with the majority's conclusion that double jeopardy concerns are not implicated when a resentencing court empanels a new jury to find the facts necessary for sentencing under section 775.082(1)(b)1., Florida Statutes. In fact, the specific characteristics of Manago's case heighten these double jeopardy concerns.

With many aggravated crimes, the aggravating factor is distinct from the facts necessary to form the underlying crime. *See, e.g.*, § 784.021, Fla. Stat. (2023) (listing the elements for aggravated

---

11. *Alleyne v. United States*, 570 U.S. 99 (2013).

12. *Williams v. State*, 242 So. 3d 280 (Fla. 2018).

- 34 -

assault). Here, however, the facts required to demonstrate that Manago "actually killed, intended to kill, or attempted to kill" the victim are highly relevant to his guilt, were alleged in the indictment, and were actually argued against by Manago at trial.

Empaneling a jury to allow the State to reargue these facts implicates double jeopardy concerns that are exacerbated by the majority's holding that it cannot conclude beyond a reasonable doubt that a rational jury would have found that Manago actually killed, intended to kill, or attempted to kill the victim. Majority op. at 23. Under these circumstances, it is difficult to view empaneling a jury here as something other than a second bite at the apple.

For these reasons, I respectfully dissent.

Application for Review of the Decision of the District Court of Appeal Direct Conflict of Decisions/Certified Direct Conflict of Decisions

Fifth District - Case No. 5D20-632

(Volusia County)

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, Daniel W. Bell, Chief Deputy Solicitor General, and Christopher J. Baum, Senior Deputy Solicitor General, Office of the Attorney General, Tallahassee, Florida,

for Petitioner

Matthew R. McLain of McLain Law, P.A., Longwood, Florida,

for Respondent